DAVID W. SHAPIRO
United States Attorney

JAY R. WEIL (California Bar No. 75434)
Assistant U.S. Attorney

MICHAEL N. WILCOVE   (D.C. Bar 359047)
Trial Attorney, Tax Division
Civil Trial Section, Southern Reg.
P.O. Box 14198
Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 514-6474
Telefax:    (202) 514-9868

Attorneys for the
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KENTFIELD MEDICAL HOSPITAL CORP., | ) ) ) | |
| | ) ) | Case No. C-01-2989 (VRW) |
| Plaintiff, | ) ) | **MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | Date:   February 21, 2001 Time:  2:00 p.m. Courtroom:    6 Judge: Vaughn R. Walker |
| _____ | ) | |

MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## ISSUES PRESENTED

For federal employment tax purposes, plaintiff treated as independent contractors physicians and psychologists who were performing services for it.  The Internal Revenue Service reclassified these physicians and psychologists as employees and assessed employment and unemployment taxes against plaintiff, along with failure to deposit penalties.  Plaintiff contends that even if they were employees, plaintiff is entitled to "safe harbor" relief under Section 530 of the Revenue Act of 1978.  Alternatively, plaintiff contends that these doctors are not employees under the common law.   Inasmuch as plaintiff has treated one psychologist as an employee, it may not seek safe harbor relief with respect to the psychologists.  In any event, plaintiff has not otherwise established a reasonable basis for treating the physicians and psychologists as independent contractors.  Moreover, under the common law, the physicians and psychologists are employees.

## INTRODUCTION

**A.     The type of tax assessed.**

Plaintiff is a for-profit rehabilitation hospital located in California.  During 1990-1995, plaintiff retained various doctors and psychologists to work as medical directors, program directors, chiefs of staff, staff physician, and psychologists.  Plaintiff treated these doctors as independent contractors and paid no federal employment or unemployment tax with respect to what it paid these doctors.[1]  The Internal Revenue Service audited plaintiff's federal employment and unemployment tax returns and determined that the doctors should have been treated as employees.  Hence, the Service assessed additional employment and unemployment tax (and failure to deposit penalties) against plaintiff.[2]

---

[1]  The psychologists were not medical doctors, but held doctorate degrees.  For ease of reference, the term "doctor" will refer to both medical doctors and psychologists.

[2]  The employment tax consists of three parts; income tax required to be withheld from the employee's wages, the employee's social security tax, and the employer's social security tax.  26 U.S.C. Sections 3102(a), 3111(a), 3402(a) and 3403(a).  Where an employer incorrectly classifies an employee as an

2

**B.      The doctors who were misclassified as independent contractors.**

   **i.      The medical director of the hospital.**

The United States claims that plaintiff misclassified its medical director, Deborah Doherty, M.D. as an independent contractor. A medical director is responsible for the "administrative and consultative oversight of the facilities [*sic*] rehabilitation program" and "ensures that the hospital's program is of high quality."[3] One psychologist who worked at the hospital testified that Dr. Doherty "set the course for the entire operation."[4] Her responsibilities are set forth in her agreement and include (1) developing policies and systems for patient care, (2) making sure that the various programs in the hospital were performing at a high level, (3) ensuring that the therapists, doctors with staff privileges, and nurses were meeting their job standards, (4) sitting on various committees, *e.g.*, charts, staff privileges, mortality, (5) ensuring that the hospital maintained its accreditation with the Committee on the Accreditation of Rehabilitation Facilities and the Joint Commission on the Accreditation of Hospitals, (6) presenting educational programs to the staff, (7) marketing the hospital's services to the community, (8) developing hospital rules and bylaws; (9) reviewing patients' charts and (10) selecting new or replacement equipment.[5]

According to Dr. Doherty, she "was involved in brainstorming on ideas for how to get a program started." After the programs were developed, Dr. Doherty made sure that the programs were

---

independent contractor, the employer is fully liable for the employer's social security tax. The employee's social security tax and income tax is, however, assessed against the employer at significantly lower rates than what the employer would have been required to pay had the employer correctly treated the worker as an employee. 26 U.S.C. Section 3509(a). Congress intended these lower rates to approximate the differential between the employer's correct employment tax liability and the tax reported by the misclassified employees on their own income tax returns. Report No. 97-494 of Committee on Finance, U.S. Senate 97th Cong. 2d Sess. at 370-372. Plaintiff is simply wrong in its assertion that a victory for the Government "will result in a collection which far exceeds any amount owed." Plaintiff's memorandum at 40, n.18. To the contrary, such a victory will reflect the liability that Congress determined that an employer should pay where employees are misclassified as independent contractors.

3/ Misitano dep. at 21.

4/ Wilson dep. at 59.

5/ Exhibit 1, pp. 2-3 to Doherty dep.; Rice dep. at. 83-95.

3

being performed well and "that the patients were getting the best care that they could."[6]  She was aware of everyone's performance in the hospital, received feedback about personnel problems and made recommendations to the hospital's management as to whether certain employees should remain with the hospital.[7]  Dr. Doherty also reiterated her role as the hospital's representative in the community and testified that, on behalf of plaintiff, she provided community outreach programs such as lectures and educational opportunities.[8]  Dr. Doherty was required to devote at least 35 hours a week to her work as the hospital's medical director and was originally paid $8,000 a month, i.e. $96,000 a year.[9]  In 1991, her compensation was increased to $12,500 a month and in 1994, it increased to $14,583.33 a month.[10]  Plaintiff also paid Dr. Doherty's malpractice insurance with respect to her work as a medical director.  She was provided with a small office and while it was not excessive, Dr. Doherty used the hospital's clerical staff when necessary to carry out those duties.[11]

### ii.  The medical and program directors for the specific divisions of the hospital

The Internal Revenue Service also determined that medical and program directors of various divisions of the hospital were improperly treated as employees. Alan Margolin, M.D. was the director of plaintiff's cardiopulmonary department.  Although limited to the cardiopulmonary department, Dr. Margolin's responsibilities were similar to Dr. Doherty's.  His responsibilities included formulating policies for the treatment of cardiopulmonary patients, quality assurance and control, assisting in the supervision of the staff, assisting plaintiff in maintaining its accreditations, assisting in the selection of new or replacement equipment, and providing educational programs.[12]  Dr. Margolin described his

---

6/ Doherty dep. at 25.

7/ Doherty dep. 22-26, 29.

8/ Doherty dep. at 23.

9/ Exhibit 1 to Doherty dep. at 4; Doherty dep., p. 67

10/ Exhibits 3 and 4 to Doherty dep.

11/ Exhibit 1 to Doherty dep. at 9-10; Doherty dep. at 33-34.

12/ Exhibit 1 to Margolin dep.

responsibilities as "setting up a multidisciplinary pulmonary rehabilitation program and giving it medical direction, maintaining the quality of the program, being available to the staff for medical direction, even if the patients weren't my own patients.  It was a constant thing of teaching and advising."[13]  Dr. Margolin was required to devote at least thirty hours a month to these tasks.[14]  In 1989, his compensation was $27,000 a year and that was increased to $36,000 a year in 1992.[15]

Alex Barchuk, M.D. worked as the program director for the hospital's trauma program, program director of the skilled nursing program, assistant program director of the pulmonary program, and as a staff physiatrist.[16]  Dr. Barchuk billed patients directly for services that he provided to them as staff physiatrist and was not paid by plaintiff for that work.[17]  For his work as program director, he was paid $5,000 per month, which was increased to $8,333.33 a month in 1994.[18]  With respect to duties for which he was not permitted to bill patients, Dr. Barchuk was required to spend at least 36 hours a week attending to them and was also required to devote at least forty-eight weeks a year to those tasks.[19]  As director of the trauma and skilled nursing programs, Dr. Barchuk was responsible for providing "medical supervision," assisting in the development of policies and procedures, serving on committees, providing quality assurance , risk management, provide utilization and medical peer review, responding to emergencies, answering medical questions, reviewing and responding to grievances, and participating in public service and community outreach.[20]

Dr. Barchuk described his role as director of the trauma program as developing the program,

---

13/ Margolin dep. at 19.

14/ Exhibit 1 to Margolin dep. at 5.

15/ Exhibit 1 to Margolin dep. at 4; Exhibit 2 to Margolin dep. at 4.

16/ Exhibit 1 to Barchuk dep. at 1.

17/ Barchuk dep. at 21.

18/ Exhibit 1 to Barchuk dep. at 8; Exhibit 2 to Barchuk dep. at 1.

19/ Barchuk dep. at 21; Exhibit 1 to Barchuk dep. at 5.

20/ Exhibit 1 to Barchuk dep. at 1-4.

5

training the staff, screening patients, serving on committees, and ensuring that the staff received the appropriate training.[21]  As program director of both the trauma and skilled nursing program, and as assistant director of the pulmonary program, Dr. Barchuk supervised staff members such as therapists and nurses.[22]  In his role as director of the trauma program, he interviewed physical therapists.[23]  As assistant director of the pulmonary program, Dr. Barchuk provided medical training to the therapists, neuropsychologists, and therapists.  In 1994, Dr. Barchuk's contract was amended to account for his being required to testify before administrative law judges.[24]  Moreover, the hospital provided Dr. Barchuk with an office and secretarial support.[25]  Plaintiff also paid at least a portion of the costs for him to attend conferences.

Paul Davidson, M.D. was the director of plaintiff's Fibromyalgia Clinic.[26]  As the sole director of the clinic, he was required to "provide all necessary and appropriate administrative services in order to facilitate efficient and effective services at the Clinic to the medical community and to Patients."[27]  His agreement demanded of Dr. Davidson responsibilities that were similar to those of Drs. Barchuk and Margolin.  Dr. Davidson was permitted to bill patients directly for his services and was paid $2,500 a month for work other than direct patient care.[28]  In 1993, his compensation was increased to $2,750 a month.[29]  Plaintiff also provided Dr. Davidson malpractice insurance for his work as director of the

---

21/ Barchuk dep. at 15-16.

22/ Barchuk dep. at 24, 39-40.  Dr. Barchuk did not, however, have the authority to discipline the staff. *See* Barchuk dep. at 36.

23/ Barchuk dep. at 28-29.

24/ Exhibit 2 to Barchuk dep. at 1; Barchuk dep. at 45-46.

25/ Barchuk dep. at 29, 30, 36.

26/ Fibromyalgia has also been referred to as chronic muscle pain syndrome.  Davidson dep. at 17.

27/ Exhibit 1 to Davidson dep. at 2.

28/ Exhibit 1 to Davidson dep. at 9.

29/ Exhibit 3 to Davidson dep.

6

clinic.[30]  Under Dr. Davidson's agreement, plaintiff was to provide him with office space and secretarial support for his work as a program director.[31]  As director of the clinic, he "would basically tell them what they needed."[32]  His work included weekly meetings with the therapists in which he reviewed the patients' care and discussed it with the therapists.[33]  He also did extensive public relations work, such as appearing on radio and television shows to discuss the clinic.[34]

Alan Kimmelman, M.D.  was the director of plaintiff's outpatient clinic.  His agreement was similar to those of the other medical and program directors.[35]  He billed patients directly for services that he provided to them individually, but was otherwise paid $8,750 a month.  Depending on the nature of the work performed, he was eligible to receive $250 an hour if he worked more than eight hours a week as a program director.[36]  Plaintiff also guaranteed that his billings from his medical practice, over and above his work as program director, would reach $100,000 a year.[37]   The hospital also agreed to provide Dr. Kimmelman with an office, secretary, car phone, and pager.[38]  He was also reimbursed for attending an annual conference held by the National Academy of Physical Medicine Rehabilitation Physicians.[39]  Dr. Kimmelman testified that the agreement accurately reflected his

---

30/ Davidson dep. at 40.

31/ Exhibit 1 to Davidson dep. at 8-9.  Dr. Davidson testified that he did not use an office at the hospital.  Rather, he only used a room to meet with the clinic's staff.  Davidson dep. at 33-34.

32/ Davidson dep. at 29.

33/ Davidson dep. at 29.

34/ Davidson dep. at 37.

35/ Exhibit 1 to Kimmelman dep. at 2-3.

36/ Exhibit 1 to Kimmelman dep. at 8.

37/ Exhibit 1 to Kimmelman dep. at 9.

38/ Exhibit 1 to Kimmelman dep. at 10.

39/ Kimmelman dep. at 48.

responsibilities.[40]  He also occasionally interviewed prospective candidates for employment, although he did not make the final decision whether or not to hire.[41]  He viewed himself as supervising the therapists working in the outpatient clinic.[42]

Other program directors had agreements that were similar to those of Drs. Margolin, Barchuk, Davidson, and Kimmelman.  For instance, Michael Post, M.D. was also a director of outpatient services. He was paid $5,416.67 a month for his services in addition to his direct billing to patients.[43] He was also provided with insurance for his work as a program director and was furnished with secretarial support, office space, fax and photocopy services, and medical journal subscriptions.[44]  He was also required to spend 38 hours a week attending to his duties as program director.[45]  Tancredi D'Amore, M.D. was the director of the hospital's program for hand and peripheral nerve services. He was required to devote sixteen hours a month to these tasks and was paid $1,667.67 a month.[46]  He was also provided with office space and clerical support.[47]

David Berman, M.D. was the Chief of Staff.  His responsibilities included, *inter alia*, serving as chairman of the executive committee of the hospital, and overseeing the clinical organization of the hospital as it pertained to practitioners, enforcing the medical staff by-laws rules and regulations, representing the views of the medical staff to the Board of Directors, and overseeing educational activities of the medical staff.[48]  Dr. Berman was paid $11,500 a year and was provided with liability

---

40/ Kimmelman dep. at 31.

41/ Kimmelman dep. at 44.

42/ Kimmelman dep. at 45.

43/ Post agreement at 8.

44/ Post agreement at 4, 7.

45/ Post agreement at 5.

46/ D'Amore agreement at 4,7.

47/ D'Amore agreement at 7.

48/ Exhibit 1 to Berman dep.; Attachment A.

8

insurance for his work as Chief of Staff, supplies, and support personnel as needed for Dr. Berman to carry out his duties as Chief of Staff.[49]  Dr. Berman described his responsibilities as

> to serve as an intermediary between the hospital and the medical staff, to help establish and maintain standards of patient care, to exchange information between the administration and the medical staff, also to ensure that such areas as medical credentials and medical records were being maintained appropriately.  And basically to try to ensure that the standard of care was maintained."[50]

Kenneth Fye, M.D. succeeded Dr. Berman as Chief of Staff and had the same responsibilities.  He, however, was paid $18,000 a year.[51]

Gerald Del Rio, M.D. was the director of respiratory therapy services.  He was responsible for providing professional guidance to and supervision of the therapists, assisting plaintiff in the selection of therapists, developing a schedule for therapist coverage, attending utilization and review committees, and assisting in the review of medical records.[52]   For this work, Dr. Del Rio was paid $500 a month.  Sam Harrell, M.D. was also retained by the hospital.  He provided occupational and general medical supervision as required by the staff, assisted in the development of patient care policies, provided quality assurance, patient care assessment, and risk management, reviewed and responded to complaints and grievances, and participated in community outreach activities.[53]   He was paid $80.00 an hour.[54]

---

49/ Exhibit 1 to Berman dep., Attachments B and C.  Dr. Berman testified that he was not provided with an office and that his use of non-physician personnel consisted of making occasional use of a secretary in the records department.  Berman dep. at 29, 31.

50/ Berman dep. at 22.

51/ Frye agreement, Attachments A and C.

52/ Del Rio agreement at 1-2.

53/ Harrell agreement, Exhibit A.

54/ Harrell agreement, Exhibit B.

9

### iii.   Psychologists

James Wilson worked for plaintiff as a neuropsychologist.  In September, 1987, he began working for plaintiff as an employee.[55]  While he was an employee, he received  medical benefits and vacation pay.  He remained as an employee until July 1988.[56]  When CMS took over, the corporation converted him to independent contractor status.[57]  During the periods in suit, Dr. Wilson was the director of  psychology services for the hospital.  He described his responsibilities as follows:

> Well, I had the responsibility of providing - foremost, providing patient care to the patients in the hospital.  And that included psychological and neuropsychological services, cognitive remediation, behavioral services, counseling, psychotherapy, the whole range of psychological services that a  psychologist would provide to a medical population, specifically a brain-injured population, because that's the unit that I was most focused on. So that's -- that was my foremost set of responsibilities.  I had other responsibilities in terms of, as I said, supervision of other people that were employed, a behavioral specialist, a testing technician, eventually psychologists that were hired.  And so I  would provide direct supervision, one-to-one supervision  for those staff, provide inservice training and educational sessions for those staff and other Kentfield  staff. I also participated in presentations that the  hospital staff gave to the community, to other  professionals, to special organizations such as organizations that deal with brain trauma. I participated with the medical director in some research that was later given in terms of  presentation.  Those were my main responsibilities.  But I  also participated in the utilization review committee,  which was a committee that reviewed the length of stay of residents at the hospital. I also participated, I believe, in quality assurance process.  I had team meetings that I attended  every week to discuss with other professionals the  patient's progress. So it was quite an active role that  I played.[58]

He was supervised by the hospital administrator and reported directly to him or her.[59]  Other psychologists, a testing technician, a behavior specialist, and therapists reported to Dr. Wilson. He participated in the process of hiring them.  [60]  Dr. Wilson did not bill patients directly for his work.[61] The hospital provided Dr. Wilson with office space and a clerical support and also paid for him to

---

55/ Wilson dep. at 10-11; Exhibit 1 to Wilson dep.

56/ Wilson dep. at 12-13.

57/ *Id.* at 13-14.

58/ Wilson dep. at 24-25.

59/ Wilson dep. at 26.

60/ Wilson dep. at 26-28.

61/ Wilson dep. at 30.

10

attend conferences a couple of times a year.[62]  Moreover, plaintiff paid for equipment that Dr. Wilson ordered such as books, videos, educational materials, and testing supplies.[63]  Dr. Wilson was required to work at least forty hours a week; 60% of his time was to be spent on direct patient care and 40% was to be spent on administrative and marketing duties.[64]  Dr. Wilson was paid $1,378.12 a week and was provided with professional liability insurance in addition to what he was required to personally carry under the terms of his agreement.[65]

Dr. Dawn Osterweil began working for plaintiff in February 1993 as a psychologist.[66]  She testified that she understood her responsibilities to be as follows:

> That I was going to see patients in individual psychotherapy, neuropsychological assessment, education, cognitive remediation, to provide family support and education, to work with patients both on the inpatient unit as well as the outpatient unit, and to meet with  physicians as needed, to meet with the team as needed, to attend team rounds and obviously to provide whatever psychological services were warranted for patient care  ethically and  legally, professionally.[67]

Dr. Osterweil generally received her referrals from Dr. Wilson.  Initially, she consulted with him on a weekly basis, although these consultations became less regular over time.  Her agreement called for her to work up to twenty-four hours a week and she was paid $28.00 an hour.[68]  After Dr. Wilson left Kentfield, Dr. Osterweil became the director of clinical psychology.  Her responsibilities were similar to those of Dr. Wilson.[69]  Her compensation increased to $33.00 an hour up to thirty hours a week.[70]

---

62/ Wilson dep. at 31-34.

63/ Wilson dep. at 34.

64/ Wilson dep. at 35-36.

65/ Wilson dep. at 42-43.

66/ Osterweil dep. at 12.

67/ Osterwiel dep. at 14; Exhibit 1 to Osterweil dep. at 2-3.

68/ Exhibit 1 to Osterweil dep. at 4.  When Dr. Osterweil saw patients in the skilled nursing facility, she was directly compensated through Medicare.  Osterweil dep. at 31.

69/ Osterweil dep. at 36; Exhibit 3 to Osterweil dep. at 3-4.

70/ Exhibit 3 to Osterweil dep. at 4.

1      Plaintiff retained other psychologists to provide treatment to patients.  Dr. Katherine Bowman

2   was paid $48,100 a year and was required to spend thirty-five hours a week attending to those duties.[71]

3   Her agreement called for her to provide services "under the supervision of James C. Wilson, PhD".[72]

4   Robert Lasser was also retained to offer psychological services to patients.  His agreement called for

5   him "to report to the Neuropsychology Department in accordance with Hospital Policy and

6   Procedures.  Besides treating patients, Dr. Lasser was required to participate in orientations, submit

7   daily records and progress notes, and comply with the pertinent bylaws, rules, and regulations.[73] He

8   was paid $40.00 an hour and was required to "respond to requests for services within forty-eight hours

9   as scheduled through the Director of Neuropsychology."[74]  Dr. Luanne Cadden had a similar agreement

10  with plaintiff.  She was paid $27.00 an hour and was required to spend twenty hours a week attending

11  to her duties.[75]  She was required to work "under the clinical supervision of the Director of the

12  Neuropsychology Department according to Hospital policy and procedures and report to the Assistant

13  Administrator of the Hospital."[76]  Dr. Judith Levinson was also required to work "under the supervision

14  of the Clinical Services Director."[77]  She was paid $60.00 an hour for up to twenty hours a week.  Dr.

15  Ameila Wilcox was paid $33.00 an hour and was required to spend a maximum of twenty-four hours a

16  week attending to her responsibilities.[78]  Drs. Bowman, Levinson, Cadden, and Wilcox were only

17

18

19  _____

20  71/ Bowman agreement at 4, 5.

21  72/ Bowman agreement at 2, 6.

22  73/ Lasser agreement at 1-2.

23  74/ Lasser agreement at 4.

24  75/ Cadden agreement at 4.

25  76/ Cadden agreement at 2.

26  77/ Levinson agreement at 2.

27  78/ Wilcox agreement at 5-6.

28                                      12

permitted to have private practices if doing so did not interfere with their work for the hospital.[79]  In addition to providing services to patients, Dr. Ron Greene was also the pain program coordinator.[80]  He was paid $84,480 a year and was required to spend at least 40 hours a week at this job.  Like other psychologists, he was only permitted to have a private practice if it did not interfere with his work for the hospital.[81]

C.      **The interplay between plaintiff and its parent and sister corporations.**

During the periods at issue, plaintiff was a subsidiary of CMS, Inc.  CMS was formed in 1986.[82]  It acquired five for profit rehabilitation hospitals and started up at least six rehabilitation hospitals, including plaintiff.[83]  At one time there were over three hundred employees in what one of the officers described as "the corporate office." [84]  CMS and these subsidiaries were extensively intertwined.  Medical and program directors for the hospitals were recruited by both CMS and the individual subsidiaries.[85]  Each subsidiary reported to a regional vice president at CMS.[86]  Anthony Misitano, a CMS officer who was the head of the hospital group, had to approve the hiring of medical and program directors and approve the renewal of the doctor's agreement.[87]  The hospital could not

---

79/ Bowman agreement at 6; Cadden agreement at 5; Levinson agreement at 5; Wilcox agreement at 6.

80/ Greene agreement at 1.

81/ Greene agreement at 4-6.

82/ Ortenzio dep. at 28.

83/ Rice dep. at 23-25.

84/ Rice dep., at 28.

85/ Rice dep. at 30-32.

86/ Rice dep. at 33.

87/ Rice dep. at 33, 81-82; Misitano dep. at 13-14.  With respect to psychologists, Misitano stated that there would be consultation between CMS and the subsidiary with respect to the psychologist's compensation..  Misitano dep. at 75. In any event, Misitano was the signatory for some of the agreements with the psychologists.  If it was necessary, the chief executive officer of a subsidiary could sign a medical agreement.  He or she would need authorization from CMS to do so. Misitano dep. at 35-36.

do so on its own.  The contracts were drafted by or at the direction of the legal department at CMS.[88]  Hence, the decision to treat the doctors as independent contractors was made by the CMS legal department.  Indeed, Misitano testified that when he signed such agreements with physicians, he placed "complete reliance" on the views and recommendations of CMS' legal department.[89]

CMS and the subsidiaries were intermingled in many other ways.  Each hospital had a Board of Governors upon which a CMS officer or employee always sat.[90]  CMS approved the budget for each hospital, as well as extraordinary expenditures[91]  Employees salaries were approved by a CMS regional vice president.[92]  Deposits into the hospital's checking accounts were swept daily into a CMS "concentration account."  Checks written by any CMS subsidiary were drawn on the concentration account.  If the deposits from the subsidiary were less than the hospital's expenditures, the shortfall was treated on the books of CMS and its subsidiaries as a loan from CMS to the hospital.  If deposits exceeded expenditures, the excess was characterized as a loan from the hospital to CMS.[93]  CMS provided the subsidiaries with human resources, legal, marketing, tax and Medicare cost report services for which the subsidiaries were charged management fees.[94]   Human resources services included providing health and workers' compensation insurance to the subsidiaries, for which the subsidiary paid its respective cost.[95]  CMS also administered a 401(k) plan in which the subsidiaries could participate.[96]

---

88/  Welsh dep. at 21; Misitano dep. at  61-62

89/  Misitano dep. at 104.  Mistano also testified that the agreements with psychologists were prepared by the legal department.  Mistano dep. at 75.

90/  Misitano dep. at 22-23.  That same person was also an officer of the subsidiary.  *Id.*

91/  Rice dep. at 106-107, 110-111; Romberger dep. at 27.

92/  Rice dep. at 104-105.

93/  Romberger dep. at 13-18.

94/  Romberger dep. at 22-23,

95/  Romberger dep. at 28-29.

96/  Romberger dep. at 48-49.

14

All employees at the subsidiaries were given a personnel handbook which had been prepared by CMS.[97]   The human resources department at CMS also handled grievances which could not be resolved at the subsidiary level and had to approve all employee terminations.[98]   As can be seen, the subsidiaries were the spokes of a wheel and CMS was the hub.

**D.      Medical directors were retained as employees at two other CMS hospitals.**

As noted above, CMS exercised strong control over its subsidiaries.  CMS's legal department determined that the doctors involved in this case should be treated as independent contractors.  A CMS vice president signed the agreement.  CMS, however, did not act uniformly.  On two occasions, it treated medical directors at other subsidiaries as employees.  At Baton Rouge Rehabilitation Hospital, John Clark, M.D. was hired as a medical director and was treated as an employee.[99]   Misitano signed Dr. Clark's contract and, upon the advice of CMS's legal department, approved his being retained as an employee.[100]   Similar to plaintiff's  medical and program directors, Dr. Clark had staff privileges at Baton Rouge Rehab and billed his own patients directly.[101]   A comparison of Dr. Clark's agreement with that of Dr. Doherty shows that there is no material difference between Dr. Clark's duties and those of Dr. Doherty.[102]   Dr. Clark was in regular contact with medical directors at other CMS hospitals, attended an annual conference of medical directors at CMS hospitals, and at other times met with some of those medical directors at smaller regional conferences.[103]   He did not perceive any germane difference between his primary responsibilities and those of the medical directors at other CMS

---

97/  Rice dep. at 109.

98/  Rice dep. at 107-109.

99/  Exhibit 2 to Rice dep; Clark dep at 11-12.

100/  Misitano dep. at 50-52.

101/  Clark dep. at 9, 29-30.

102/  *Compare* Exhibit 1 to Doherty Deposition *with* Exhibit 2 to Rice deposition.

103/  Clark dep. at 56-60.

15

1  hospitals.[104]

2       Likewise, at another CMS subsidiary, Braintree Hospital, the medical director was an

3  employee.[105]  CMS acquired Braintree in the late 1980's.[106]  James Liljestrand, M.D. had been the

4  medical director before CMS acquired it and remained in that position until 1998.[107]  His responsibilities

5  as medical director included marketing the hospital, putting on education programs, recruiting

6  physicians, advising new employees of their expectations, ensuring that the hospital maintained its

7  accreditations, reviewing the bylaws, addressing quality assurance and risk management, acting as a

8  liaison between doctors and patients, acting as a liaison between the doctors and the hospital's Board

9  of Directors.[108]  While Dr. Liljestrand did not have his own private practice as did plaintiff's medical

10  directors, his responsibilities as medical director were the same as those of plaintiff's medical directors.

11       In short, CMS controlled its subsidiaries in many different ways.  Most significantly, CMS

12  determined that plaintiff's physicians and psychologists should be treated as independent contractors.

13  CMS also approved the hiring and dismissal of its subsidiaries' physicians and psychologists, frequently

14  signed their agreements, and approved their compensation and other terms of their work.  Yet, CMS

15  did not treat its medical directors consistently. Specifically, CMS chose to treat two of their medical

16  directors as employees. As will be discussed below, this creates a factual question as to whether the

17  persons making the decision to treat the doctors as independent contractors actually relied upon the

18  factors claimed or whether they acquiesced to the doctors' preferences and are now using these factors

19  as an excuse.

20

21

22  _____

23  104/  Clark dep. at 57.

    105/  Liljestrand dep. at 13.

24  106/  Liljestrand dep. at 20.

25  107/  Liljestrand dep. at 9.  Dr. Liljestrand's title was medical director and vice president of medical

26  affairs.  His duties with respect to both of these titles were indistinguishable.  *Id.*

27  108/  Liljestrand dep. at 13-17.

28                      16

1  ARGUMENT

2  **A.   Introduction**

3    As held in Vander v. United States Department of Justice, 268 F. 3d 661, 663 (9th Cir. 2001),

4  summary judgment may only be granted if after reviewing the record as a whole and drawing all

5  reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact.

6    Whether an individual is an employee or independent contractor depends on all of the facts and

7  circumstances of each case, with no one factor being absolute. Hospital Resources Personnel, Inc., v.

8  United States, 68 F. 3d 421, 427 (11th Cir. 1995); Weber v. Commissioner, 60 F. 3d 1104, 1110

9  (4th Cir. 1995).  In making that determination, the fact-finder applies common law rules. *Id.*  Even if,

10  however, a worker meets the common-law definition of employee, a taxpayer retaining that worker's

11  services is not liable for a federal employment or unemployment tax if the taxpayer fits within the

12  purview of Section 530 of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763. Provided the

13  employer complies with certain prerequisites, an employer may invoke Section 530 if it demonstrates

14  reasonable reliance on any of the following:

15    (A)    judicial precedent, published rulings, technical advice with respect to the taxpayer, or a
       letter ruling with respect to the taxpayer;

16

17    (B)    a past Internal Revenue Service audit of the taxpayer....

18    (C)    long standing recognized practice of a significant segment of the industry in which such
       [worker] was engaged.

19    In addition to these three safe harbors, a taxpayer is not subject to employment or

20  unemployment tax liability if it can show that it relied upon some other reasonable basis for treating the

21  workers as independent contractors.  Boles Trucking, Inc., v. United States, 77 F. 3d 236, 239 (8th

22  Cir. 1996).  In order to successfully invoke Section 530, a taxpayer must do more than simply show,

23  after the fact, there were grounds by which the worker could be classified as an independent

24  contractor.  Rather, the taxpayer must affirmatively show that it relied upon those grounds. 302 West

25  42nd St. Enterprises, Inc., v. Internal Revenue Service, 181 F. 3d 272, 277 (2d Cir. 1999); West

26  Virginia Personnel Resources, Inc., v. United States, 1996 WL 679643 *9 (S.D W. Va. 1996).

27

28

17

1  **B.      With respect to the psychologists, plaintiff cannot avail itself of Section 530 because from 1987-1988, it treated one psychologist as an employee.**

2

3          In order for a taxpayer to be able to avail itself of Section 530, it must meet, *inter alia*, the

4  "substantive consistency test", which is defined as follows:

5          the taxpayer (and any predecessor) has not treated any individual holding a substantially similar position as an employee for purposes of the employment taxes for periods beginning after December 31, 1977.

6

7  Section 530(a)(3) of the Revenue Act of 1978. Institute for Resource Management, Inc., v. United

8  States, 22 Cl. Ct. 114, (1990); Crowd Management Services, Inc. v. United States,, 889 F. Supp.

9  1313, 1316-1317 (D. Ore. 1995); In re Critical Care Support Services, 138 B.R. 378 (Bankr. E.D.

10 N.Y. 1992). Put another way, if at any time after December 31, 1977, plaintiff treated a psychologist

11 as an employee , it may not avail itself of Section 530 and must simply took to the common law.  It is

12 undisputed that from September 1987 to July 1988, plaintiff retained Dr. James Wilson as an employee.

13 While CMS decided to convert Dr. Wilson to independent contractor status shortly after it acquired

14 Kentfield, the fact remains that Kentfield maintained its same corporate existence both during the time

15 that Dr. Wilson was an employee and after CMS bought the hospital.

16          Hence, Section 530 relief is simply not available with respect to the psychologists that the IRS

17 reclassified as employees.  In its memorandum plaintiff states that " a few weeks after Dr. Wilson's

18 arrival, the facility was acquired by CMS." [109]  The undisputed evidence is that plaintiff treated Dr.

19 Wilson as an employee for ten months.  That is not *de minimis*.  Plaintiff further contends that an Internal

20 Revenue Service Litigation Guideline Memorandum states that "the single treatment a single [*sic*] as an

21 employee does not destroy substantive consistency."  In the first place, the litigation guideline is not

22 precedent and is not binding on the Government.  26 U.S.C. Section 6110(k)(3) (formerly section

23 6110(j)(3)); Sierra Club v. Commissioner, 86 F. 3d 1526, 1534 (9th Cir. 1996); ("IRS internal

24 memoranda, however, are not binding on the IRS or in court."); United States v. Derr, 968 F. 2d 943,

25 946 (9th Cir. 1992)( IRS internal policies do not provide "legally enforceable rights"); Stiching

26 Pensionefunds Voor De Gezondheid v. United States, 129 F. 3d 195, 200 (D.C. Cir. 1997)(IRS

27 ─────────────────
   109/ Plaintiff's memorandum at 4, n2.

28                                                    18

1   general counsel memoranda have no precedential value). Indeed, the last page of the memorandum

2   specifically states "This document may not be used or cited as precedent." Moreover, the litigation

3   guideline does not state as a matter of law that treating one worker as an employee does not destroy the

4   substantive consistency test. Rather, it simply discusses when the IRS will recommend defending a case

5   on substantive consistency grounds.[110] A recommendation as to when to pursue a defense is not a

6   statement of law. Plaintiff has offered no caselaw, statute or other precedent to support its theory that it

7   gets a free pass for treating Dr. Wilson as an employee. To the contrary, the plain language of the

8   statute precludes its theory that plaintiff may still avail itself of Section 530 relief with respect to the

9   psychologists.

10          Plaintiff also points out that it requested defendant to admit that the substantive consistency test

11  was met. On February 23, 2001, before Dr. Wilson gave his deposition, the United States admitted this

12  request. Not until Dr. Wilson gave his deposition on May 7, 2001 did defendant realize that Dr. Wilson

13  had been plaintiff's employee. Because defendant did not learn of Dr. Wilson's employment status until

14  after the request was made, there are ample grounds for the admission to be withdrawn as it pertains to

15  the psychologists, and defendant will shortly move to withdraw the admission. As held in Hadley v.

16  United States, 45 F. 3d 1345, 1348. the court may permit an admission to be withdrawn if the following

17  two requirements are met (1) presentation of the merits of the action must be subserved and (2) the

18  party who obtained the admission must not be prejudiced by the withdrawal." There is no question that

19  presentation of the merits will be subserved. That being so, plaintiff will have the burden of proving

20  prejudice. As stated in Hadley, "the prejudice contemplated by Rule 36(b) is not simply that the party

21  who obtained the admission will now have to convince the factfinder of its truth. Rather, it relates to the

22  difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because

23  of the sudden need to obtain evidence." Id. at 1348. It is difficult to perceive what evidence plaintiff

24  could locate to contradict the indisputable fact that plaintiff treated Dr. Wilson as an employee from July

25  1987 to September 1988. Certainly, plaintiff should have records of whom its employees were and the

26  _____

27  110/ Litigation Guideline Memorandum at 5.

28                                                  19

1   periods when they were so employed.  If there is any evidence to dispute Dr. Wilson's assertions

2   regarding his employment, plaintiff should have it and should offer it in support of its motion.  Defendant

3   is further willing to stipulate that plaintiff treated no other psychologist as an employee from December

4   31, 1977 through the periods in suit.  While these points will be made in more detail in a motion to

5   withdraw the admission, plaintiff will be hard-pressed to show prejudice.

6         Inasmuch as there can be no question that plaintiff treated Dr. Wilson as an employee from July

7   1987 to September 1988, plaintiff may not avail itself of Section 530 relief with respect to the

8   psychologists whom it improperly classified as employees.

9   **C.      Plaintiff cannot establish that its decision to treat its  medical directors as independent**
    **contractors was based upon a reasonable reliance on industry practice.**

10

11        **i.      Plaintiff may not contend reliance on the practice that was instituted by**
    **the same persons who classified the doctors in this case as independent contractors.**

12        With respect to the physicians only, and not the psychologists, plaintiff claims that

13   it is entitled to safe harbor relief because it relied upon the "long standing practice of the for profit

14   rehabilitation industry." Plaintiff relies upon the testimony of four officers of CMS, *i.e.*, Anthony

15   Misitano, Deborah Welsh, Robert Ortenzio, and Patricia Rice.  In the first place, neither Misitano, Rice,

16   nor Ortenzio were involved in any meetings or discussions at CMS in which they discussed whether

17   doctors should be treated as employees or independent contractors.[111]   Misitano placed complete

18   reliance on CMS's legal department.[112]   Inasmuch as Rice, Misitano, and Ortenzio did not make the

19   decision to treat plaintiffs' physicians as independent contractors, their testimony is of limited use in

20   showing *reliance* on industry practice.  *See* 302 West 42nd St. Enterprises, Inc., 181 F. 3d at 277;

21   West Virginia Personnel Resources, Inc., 1996 WL 679643 *9.

22        Moreover, before being officers of CMS, Misitano, Ortenzio, and Welsh were officers of Rehab

23   Hospital Services Corporation ("RHSC").[113]   RHSC owned and operated free standing rehabilitation

24   _____

25   111/  Ortenzio dep. at 40; Misitano dep. at 37; Rice dep. at 65.

26   112/  Misitano dep. at 104.

27   113/  Ortenzio dep. at 7-8; Welsh dep. at 5-6; Misitano dep. at 8-9.

28                                              20

1   hospitals with an average of 40-80 beds.[114] The company was started by Robert Ortenzio's father, was

2   formed in 1979, went public in about 1983, and was sold to National Medical Enterprises in 1985.[115]

3   RHSC was one of the first companies to build free-standing rehabilitation hospitals of that size.[116] In

4   1986, Robert Ortenzio and his father founded CMS, which built or acquired the same type of hospitals

5   that RHSC did.[117] Misitano and Welsh followed the Ortenzios to CMS.[118] Hence, to the extent that

6   Welsh, Ortenzio, and Misitano are relying upon RHSC's treatment of its physicians as showing industry

7   actions, they are simply relying on their own actions. Section 530 was not intended to permit this type of

8   bootstrapping. Indeed, an employer may not rely upon a predecessor's practices to avail itself of

9   Section 530 relief. West Virginia Personnel Services, 1996 WL 679643* 8. The rationale, of course,

10   is that an employer may not use its own conduct as a reliance on industry practice. There is no

11   difference between relying on a predecessor's actions and forming a new company and relying on the

12   actions of the old one.

13        **ii**     **The generalized testimony offered by plaintiff is insufficient to establish industry practice.**

14

15       As plaintiff pointed out in its motion for summary judgment, in General Investment Corporation

16   v. United States, 823 F. 2d 337 (9th Cir. 1987), the Ninth Circuit held that a mining company

17   established industry practice through the testimony of its president and another mine operator that they

18   learned of industry practice through meetings with mine owners and numerous visits to other mines. Id.

19   at 341. Even under this standard, plaintiff has not established industry practice. Again, plaintiff attempts

20   to show reliance on industry practice through the testimony of Welsh, Misitano, Ortenzio, and Rice.

21   Inasmuch as Rice and Ortenzio were not involved in the decision to treat the doctors as independent

22   _____

23   114/ Ortenzio dep. at 9-10, 45.

24   115/ Ortenzio dep. at 8-9, 21, 26.

25   116/ Ortenzio dep. at 45; Rice dep. at 20-21; Welsh dep. at 9.

26   117/ Ortenzio dep. at 27, 48-49, 53.

27   118/ Misitano dep. at 8-9. He joined CMS in 1988. Welsh dep. at 6. She joined CMS in 1986.

28                          21

1   contractors and Misitano testified that he placed complete reliance on Welsh, their views of industry

2   practice are not relevant.  Hence, any reliance on industry practice must emanate from Welsh.  Plaintiff

3   alleges that Welsh learned of the industry practice through attending seminars and talking with the general

4   counsel of other corporations.  In particular, she testified that she discussed industry practice with the

5   general counsel of HCA, HealthSouth, and Humana.   The only documentation that she could offer were

6   blank medical director agreements used by Humana.[119]  The first page of each agreement shows that the

7   medical director is to work in a division of an acute care hospital, not a free-standing rehabilitation

8   hospital.  Welsh acknowledges that "it's a little bit of two different worlds whether you're an acute care

9   or a rehab or a psychiatric."[120]  It is not clear from Welsh's testimony whether the general counsels to

10  whom she is referring were discussing experiences with acute care hospitals or some other type of

11  hospital.  Likewise, with respect to the seminars that she attended, Welsh testifies that physician

12  contracting for rehabilitation hospitals was part of the presentation.[121]  Yet, plaintiff offers no materials

13  from the seminar,  testimony from other rehabilitation hospitals, or a survey to support Welsh's assertion.

14  In short, Welsh's testimony amounts to little more than her own generalization that rehabilitation hospitals

15  not connected with CMS or RHSC treated its doctors as independent contractors.  Even under the

16  General Investment , her testimony does not establish reliance on industry practice.

17      In Dutch Square Medical Center Limited Partnership v. United States, 1994 WL 605850,

18  (D.S.C. 1994),  the court held that, as a matter of law, the medical director of an urgent care facility was

19  an employee.  In response to plaintiff's assertion that "it was just following a recognized practice of the

20  urgent care industry in the Midlands area,"  the court noted that plaintiff offered "no statistical information

21  to support that assertion."  Id. *5.  As the court did in Dutch Square, this Court should find plaintiff's

22  generalized testimony about industry practice to be insufficient.

23      Plaintiff fares no better with Patricia Rice's testimony regarding industry practice, even if she had

24

25  119/  Welsh dep.; Exhibits 11 and 12.

26  120/  Welsh dep. at 44.

27  121/  Welsh dep. at 45.

28                              22

1    been part of the decision to treat the physicians as independent contractors. She testified that, as a

2    surveyor for the Committee on Accreditation of Rehabilitation Hospitals, she reviewed physician

3    agreements which uniformly classified the doctors as independent contractors. Rice, however, candidly

4    stated that she did not know if the hospitals were a representative sample.[122] With this admission, Rice's

5    experience as a surveyor does not show industry practice as a matter of law. Plaintiff also offers Rice's

6    experience at one hospital before she joined CMS.[123] Experience at one hospital is insufficient to show a

7    long standing industry practice.

8         The same holds true for the testimony of Misitano and Ortenzio. As stated above, to the extent

9    that they call on RHSC's practice of treating doctors as independent contractors, they are relying upon

10    their own experience. Besides his experiences at RHSC, the most that Ortenzio offers is a bald assertion

11    that "in the general health care industry", physicians are generally independent contractors.[124] Misitano

12    also makes a bare assertion that it was the "industry norm." When it comes time for specifics, he can

13    only offer his own experiences at RHSC and the fact that the company that acquired RHSC continued

14    the practice. In essence, Misitano is bootstrapping his own experiences. While Misitano refers to his

15    experiences at HealthSouth, that did not occur until 1996 or 1997, after the periods in suit.[125] Hence,

16    Misitano's experiences at HealthSouth are irrelevant.

17         Finally, plaintiff offers the conclusory affidavit of John Behrmann, the former chief executive

18    officer of plaintiff. Behermann lists "competitors" that employ medical directors as independent

19    contractors. Only two of them are rehabilitation hospitals. The others are rehabilitation units within

20    hospitals. Indeed, for seven of the facilities, Behrmann states that he does not know the titles of the

21    physicians purportedly treated as independent contractors. Plaintiff, however, offers no information

22    about these facilities or the duties of the medical and program directors at those facilities. Because of

23    _____

24    122/  Rice dep. at 59.

25    123/  Rice dep. at 51-52.

26    124/ Plaintiff's memorandum at 25.

27    125/ Misitano dep. at 42.

28                                        23

1   these failures, Behrmann's affidavit does not establish industry practice.

2        In short, plaintiff's evidence regarding industry practice consists of little more than the CMS

3   officers' prior experience with RHSC and Welsh and Rice's generalized testimony about industry

4   practice. That is insufficient for plaintiff to be entitled to judgment as a matter of law.[126]

5       **iii.   Plaintiff has not shown that any reliance on industry practice was reasonable.**

6        In order for an employer to be afforded relief under Section 530, the employer must do more

7   than show its reasons for treating the workers as independent contractors. It must also show that its

8   reliance on those grounds was reasonable. <u>Marlar, Inc., v. United States</u>, 151 F. 3d 962, 966 (9th Cir.

9   1998). Here, the people who controlled the classification of doctors treated medical directors at two

10  other hospitals as employees. While the CMS officers assert that industry practice anchors their

11  decision to treat the medical directors and program directors as independent contractors, their own

12  action in treating two medical directors as employees belies any assertion that CMS' reliance on industry

13  practice was reasonable. Rather, it shows that plaintiff is using industry practice as an excuse, not as a

14  reasonable basis.

15      **iv.   Plaintiff has not shown sufficient reliance on professional advice to be entitled to**
16  **summary judgment.**

17       Plaintiff alleges reliance on counsel's advice as another basis for treating the doctors as

    independent contractors. Turning first to the psychologists, plaintiff has no basis for asserting reliance on
18
    the advice of counsel. Welsh did not know if it was industry practice to treat psychologists as
19
    independent contractors, nor could she recall having any meetings or discussions as to whether the
20
    psychologists should be employees or independent contractors, and she did not recall discussing the
21
    question with outside counsel.[127]
22
         Plaintiff does not fare better when it relied on advice of CMS legal counsel, particularly Deborah
23

24  _____

25    126/ Plaintiff also refers to Dr. Doherty's testimony that physicians knew that it was the industry
    for then to be treated as independent contractors. Plaintiff's memorandum at 29, n.15. There is no
26  evidence that plaintiff relied upon Dr. Doherty's experiences in deciding to treat the doctors as
    independent contractors.

27    127/ Welsh dep. at 56-57.

28  24

1   Welsh, as a reasonable basis for treating the physicians as independent contractors.  Plaintiff argues that

2   Welsh discussed the issue with outside counsel Harvey Werblowski and with various local counsel.

3   Plaintiff offers no declaration from either Werblowski or any of the local counsel as to what information

4   the outside counsel was given about the operations of CMS, the type of research they undertook, or the

5   specific advice they gave Welsh.[128]   Without this type of information, there is no way to test whether the

6   attorney's advice was informed or reasonable.  *See* In re McAtee, 115 B.R. 180, 184-185 (Bankr.

7   N.D. Iowa 1990)(claim of reliance on accountant's advice rejected where name of accountant not

8   revealed, accountant did not testify, and there was no evidence as to "exactly what advice the

9   accountant gave debtor or what information debtor gave accountant"); *compare* Smoky Mountain

10  Secrets, Inc., v. United States, 910 F. Supp. 1316, 1323 (E.D. Tenn. 1993)(accountants who offered

11  advice testified as to their qualifications and the information that they received from employer).

12      Moreover, while plaintiff asserts that Werblowski and Welsh reviewed the IRS' "twenty factor"

13  test to determine if a worker is an employee or independent contractor, Welsh candidly testified that she

14  did not recall asking Werblowski's firm to analyze those factors.[129]   Likewise, plaintiff argues that "local

15  counsel would draft the agreements to be consistent with state law."[130]   That is not accurate.  More

16  specifically, the contracts were drafted in-house by Welsh or under her direction.  Some contracts were

17  prepared or reviewed by outside counsel, depending on the workload of the in-house staff.[131]   In this

18  regard, plaintiff is wrong in its assertion that local counsel would draft the agreement and that CMS's

19  corporate counsel would finalize them.[132]   As can be seen, plaintiff overemphasizes the weight that may

20  be given to any advice given by outside counsel.  Finally, plaintiff is unable to produce any memoranda

21

---

22  128/  The only exception is that Welsh produced a four page letter from outside counsel setting forth
    a capsule summary of the corporate practice of medicine doctrine for nineteen states.  As will be
23  discussed below, however, the corporate practice of medicine doctrine offers no relief to plaintiff.

24  129/  Welsh dep. at 34.

25  130/  Plaintiff's memorandum at 23.

26  131/  Welsh dep. at 21, 30.

27  132/ *See* plaintiff's memorandum at 17.

28                                              25

1   or other documents reflecting Welsh's work on these matters.  They have not been found.[133]  Without

2   these documents, defendant does not have the opportunity to test Welsh's assertions as to her inquiries

3   into the proper treatment of the CMS doctors.

4          With no evidence as to the information that was given to outside counsel and the specific advice

5   rendered and with plaintiff being unable to produce any documents to back up Welsh's inquiries into the

6   proper treatment of the doctors, plaintiff is simply not entitled to judgment as a matter of law.[134]

7          **v.     The "corporate practice of medicine doctrine" does not provide plaintiff with a**
    **reasonable basis for treating the doctors as independent contractors.**

8

9          Plaintiff asserts that the corporate practice of medicine doctrine serves as a reasonable basis for

10  treating the doctors as independent contractors. Plaintiff cites California law prohibiting for-profit

11  medical facilities from employing physicians.  That body of law is irrelevant. The United States is not

12  bound by a state determination of employee or independent contractor status.  <u>Spicer Accounting v.</u>

13  <u>United States</u>, 918 F. 2d 90, 94 (9th Cir. 1990) (state audit).   After all, liability for federal employment

14  or unemployment tax is a question of federal law.  A state may not through its  statutes and judicial

15  precedent dictate federal tax law.  With respect to matters solely within its purview, a state may, of

16  course, regulate when medical facilities may or may not employ physicians or psychologists.  Such

17  regulation may not, however, serve to hogtie the federal Government in its enforcement of federal tax

18  laws.

19          Moreover, plaintiff's attempt to invoke the corporate practice of medicine doctrine begs the

20  question.  As noted in <u>Conrad v. Medical Board of California</u>, 55 Cal Rptr 2d 901, 903,n4 (Ct. App.

21  4th Dist. 1996), "the principal test of an employment relationship is whether the employer has the right to

22  control the manner and means of accomplishing the result desired."  If plaintiff exercised sufficient control

23   133/ Welsh dep. at 39-40.

24   134/ As plaintiff has pointed out, a court recently held that, as a matter of law, one of plaintiff's sister
     corporations was entitled to Section 530 relief on the grounds that the hospital reasonably relied upon
25   the advice of CMS's general counsel in treating its medical and program directors as independent
     contractors.  <u>North Louisiana Rehabilitation Center, Inc. v. United States</u>, ____ F. Supp.2d ____ ,
26   2002 WL 1589528(W.D. La. 2001) This decision is not binding on this Court and defendant
     respectfully submits  that the case was incorrectly decided.  Moreover, that case did not involve
27   psychologists.

28                                          26

1   over the physicians and psychologists so as to create an employer/employee relationship, plaintiff would

2   be breaching the corporate practice of medicine doctrine, regardless of how plaintiff and the doctors

3   choose to label their relationship.  In other words, the question is not whether the corporate practice of

4   medicine doctrine precluded plaintiff from employing doctors, but whether, under the common law, the

5   doctors are employees.  As can be seen, the common law test steers both plaintiff's liability for the taxes

6   and plaintiff's compliance with the corporate practice of medicine doctrine.

7       In any event, the corporate practice of medicine doctrine affords plaintiff no protection with

8   respect to the psychologists.  Plaintiff cites a 1979 opinion by the California Attorney General which

9   concludes that a for-profit hospital may not employ a psychologist on a salaried basis to render services

10  on behalf of the hospital and bill patients for those services.  In the first place, there is no evidence

11  Deborah Welsh, or anyone else, relied upon this opinion as grounds for treating the psychologists as

12  independent contractors.  To the contrary, Welsh frankly testified that while she thought that California

13  applied the corporate practice of medicine doctrine to psychologists, she did not know for certain.[135]

14  Likewise, she did not know whether any CMS subsidiaries treated psychologists as employees or

15  whether it was industry practice for rehabilitation hospitals to treat psychologists as independent

16  contractors.[136]  Likewise, she does not recall having any discussions about the proper way to classify

17  psychologists or receiving any opinion from outside counsel on this question.[137]  Inasmuch as plaintiff did

18  not rely on the corporate practice of medicine doctrine as a basis for treating the psychologists as

19  independent contractors, that doctrine does not provide Section 530 relief with respect to those

20  psychologists.  302 West 42nd St. Enterprises, Inc., 181 F. 3d at 277; West Virginia Personnel

21

22

---

23  135/ Welsh dep. at 58.  Dr. Wilson testified that CMS switched him to independent contractor status
    because of concern about whether California law permitted plaintiff to employ psychologists.
    Wilson dep. at 13-14.  Dr. Osterweil also made a vague reference to the issue.  Osterweil dep. at 12-13.

24  This does not militate against Welsh's testimony that she did not know, for certain, if the corporate
    practice of medicine doctrine applied to psychologists.  Moreover, Dr. Wilson's and Dr. Osterweil's

25  testimony about the concerns of CMS is hearsay and inadmissible.

26  136/ Welsh dep. 55-56.

27  137/ Welsh dep. at 57.

28                                        27

Resources, Inc., 1996 WL 679643 *9.

**vi.     The common law factors do not offer a reasonable basis for treating the physicians and psychologists as independent contractors.**

Plaintiff asserts that an analysis of the common law factors offers a reasonable basis for treating the physicians and psychologists as independent contractors.  Plaintiff places great emphasis on the lack of control that plaintiff or CMS exercised over the way that the doctors perform their tasks.  In so doing, plaintiff quotes one case that indicated that it has been "unanimously" held that physicians are independent contractors.[138]   To the contrary, courts have not given employers carte blanche to treat physicians or other medical personnel as independent contractors.

As a general matter, whether an individual is an employee or independent contractor is based upon an analysis of all of the facts and circumstances, with no one factor being determinative.  Weber v. Commissioner, 60 F. 3d 1104, 1110 (4th Cir. 1995).  The Internal Revenue Service has set forth the following twenty non-exclusive factors to be used in determining whether a worker is an employee or independent contractor:   (1) instructions from the employer;  (2) training;  (3) integration of worker's services into employer's  business;  (4) worker's services rendered personally;  (5) a continuing relationship between worker and employer;  (6) set hours of work;  (7) mandatory full-time employment;  (8) work on employer's premises;  (9) set order of tasks;  (10) oral or written  reports;  (11) payment by the hour, week, or month;  (12) right to discharge for reasons other than nonperformance;  (13) worker's right to hire, supervise, and pay assistants;  (14) payment of  own business and/or travel expenses;  (15) furnishing own tools and materials;  (16) significant investment;  (17) realization of  profit or loss; (18) right to work for more than one firm at a time;  (19) right to make service available to the general public;  and (20) right to terminate without incurring liability.  Hospital Resource Personnel, Inc, v. United States, 68 F. 3d 421, 427 (11th Cir. 1995); Rev. Rul. 87-21, 1987 C.B. 296.

As stated in Hospital Resources, the factors collectively "define the extent of an employer's control over the time and manner in which a worker performs." Id.

138/  Plaintiff's memorandum at 8.

28

1    The control test is fundamental to determining employee or independent contractor status.

2    Hospital Resources Personnel, 68 F. 3d at 421. While degree of control is "of great importance", it is

3    not exclusive. Weber v. Commissioner, 60 F. 3d 1104, 1109 (4th Cir. 1995). Plaintiff overlooks the

4    fact that when it is applied to professionals, "the threshold level of control is generally lower than when

5    applied to nonprofessional services." Id. at 1110. Indeed, Weber held that a minister was an employee

6    of the Concord United Methodist Church. See also Eren v. United States, 180 F. 3d 594 (4th Cir.

7    1999)(architect found to be employee).

8    Likewise, courts have in many different instances found doctors to be employees of hospitals or

9    other medical organizations. Forty-five years ago, in James v. Commissioner, 25 T.C. 1296 (1956) the

10   Tax Court found a director of pathology to be an employee of a hospital.   Rejecting the doctor's

11   assertion that the hospital lacked control over the way that the doctor performed his work, the Tax

12   Court aptly noted:

13   > The question is whether that control is sufficient to warrant a finding that petitioner is an
     > employee rather than an independent contractor.  We are of the opinion that under the facts of
14   > this case, in which petitioner is a professional man, the control of the hospitals is sufficient to
     > constitute petitioner an employee rather than an independent contractor. The methods by which
15   > professional men work are prescribed by the techniques and standards of their professions. No
     > layman should dictate to a lawyer how to try a case or to a doctor how to diagnose a disease.
16   > Therefore, the control of an employer over the manner in which professional employees shall
     > conduct the duties of their positions must necessarily be more tenuous and general than the
17   > control over nonprofessional employees. Yet, despite this absence of direct control over the
     > manner in which professional men shall conduct their professional activities, it cannot be doubted
18   > that many professional men are employees. To give an example outside of the medical
     > profession, there are many eminent lawyers who are full-time employees of corporations and
19   > who carry on their professional work with a minimum of direct supervision or control over their
     > methods on the part of their employee.
20
     Id. at 1301.
21
22   Since then, doctors have been found to be employees in many other contexts.  In Dutch Square

23   Medical Center, the court held that, as a matter of law, the medical director of an urgent care facility was

24   an employee.  That doctor's responsibilities included supervising the nursing and ancillary staff, reviewing

25   the medical services of the physicians who worked at the center, implementing quality assurance

26   programs, and overseeing related patient care.  1994 WL 605850 *2.  These responsibilities are

27   strikingly similar to the responsibilities of plaintiff's physicians.  Likewise in Idaho Ambucare Center, Inc.

28                                                29

v. United States, 57 F. 3d 752 (9th Cir. 1995), a doctor who spent four to five hours a week working as an administrative manager for a surgery facility was found to be an employee as a matter of law. The Ninth Circuit noted that the doctor "performed substantial services, including financial planning and policymaking, managing the facility, maintaining records, determining employee raises and the like." *Id.* at 757. Although the tasks of plaintiff's physicians do not totally square with those of the administrative manager in Idaho Ambucare , there can be no question that plaintiff's doctors performed substantial services for plaintiff. As can be seen by Idaho Ambucare, independent contractor status is not determined simply by the fact that the doctor only devotes a few hours a week to those tasks.

In several other instances, doctors have been found to be employees. *See e.g.*, Cody v. Ribicoff, 289 F. 2d 394 (8th Cir. 1961)(doctor employee of partnership and, therefore, entitled to social security benefits); Fleming v. Huycke, 284 F. 2d 546 (9th Cir. 1960 (same); Salameh v. Provident Life & Accident Insurance Company, 23 F. Supp2d 704 (S.D. Tex. 1998)(doctor employee of urology practice for purpose of determining if disability plan subject to ERISA provisions); Aronson v. Commissioner, T.C. Memo 24428, 1985 WL 24428 (1985) (doctor who worked for state health department); Cowing v. Commissioner, T.C. Memo 1969-135, 1969 WL 1142 (1969)(doctor who managed radiology department). While the facts in these cases are not the same as the ones presented here, they dispel the notion that doctors are uniformly treated as independent contractors.[139]

Likewise, plaintiff's reliance on a federal tax regulation, 26 C.F.R. Section 31.3121(d)-1(c)(1) is misplaced. That regulation notes that individuals such as physicians *in pursuit of an independent trade, business, or profession in which they offer their services to the public* are independent

---

139/ Defendant recognizes a line of cases involving suits against the United States under the Federal Tort Claims Act. In these cases, the plaintiffs alleged that a doctor was an employee of the United States, resulting in the Government being liable for the doctor's negligence. The doctors were held to be independent contractors, resulting in the Government's being immune from suit under the doctrine of sovereign immunity. *See e.g.*, Carrillo v. United States, 5 F. 3d 1302, 1304 (9th Cir. 1993) Broussard v. United States, 989 F. 2d 171 (5th Cir. 1993); Robb v. United States, 80 F. 3d 884 (4th Cir. 1996). However, as Robb noted, waivers of sovereign immunity are strictly construed, mandating that the independent contractor exception to the Federal Tort Claims act be construed broadly. 80 F. 3d at 887. Employee or independent contractor status for tax purposes does not affect waivers of sovereign immunity and there is no mandate that the independent contractor status be given any special breadth.

30

1  contractors. Here, the tax was not assessed on account of the doctors' private practices. The tax was
2  assessed on account of administrative work that they performed for the hospital.

3      It is clear that all of the doctors' activities were deeply integrated into the function of the hospital.
4  Their work amounted to far more than guidance and consultation. Taking into account the lower
5  threshold of control that is applied to professionals, it can be seen that all of the doctors are employees.
6  Dr. Doherty set the course for the entire hospital. She was required to work at least thirty-five hours a
7  week and earned anywhere from $96,000 to $178,236. Dr. Barchuk, the director of several programs
8  offered services that were integral to the functioning of the hospital. He was paid $100,000 a year and
9  worked at least thirty-six hours a week. Dr. Kimmelman was paid $95,000 a year as director of the
10  outpatient clinic and was responsible for seeing that the clinic ran correctly. Dr. Post was paid $5,416 a
11  month and was required to spend at least thirty-seven hours a week attending to his duties as director of
12  outpatient services. While other doctors such as Drs. Berman, Del Rio, Margolin, and Frye were paid
13  less and spent fewer hours attending to those specific responsibilities, their services were also sufficiently
14  integrated into the hospital's operations so as not to be considered independent contractors under the
15  common law. As discussed above, the fact that they were professionals lessens the weight given to the
16  fact that plaintiff could not micro-manage the way that they carried out their duties.

17      Without question, the psychologists are not independent contractors as a matter of law. Dr.
18  Wilson testified that he was supervised by the hospital administrator and reported to him or her. He
19  worked full time, supervised other staff, and scheduled patient referrals to the other psychologists. Dr.
20  Osterweil and the other psychologists were also integrated into the hospital's operations. Drs. Bowman,
21  Cadden, and Ladden signed agreements which specifically called for them to work under the supervision
22  of the director of either the neuropsychology department or clinical services. Drs. Bowman, Levinson,
23  Cadden, Wilcox, and Greene were only allowed to have private practices if doing so did not interfere
24  with their work for the hospital. When a lesser threshold is applied to the control test, it can be seen that
25  the psychologists are employees and not independent contractors.

26
27
28

1   **vii.    Plaintiff may not evade liability by arguing that the some of the doctors were**
2   **employed by their own professional corporations.**

3          Plaintiff alleges that some of the doctors operated through their own professional corporations

4   and were, therefore, employees of their professional corporations.[140]  Plaintiff misses again.  Except for

5   Dr. Kimmelmann, all of the agreements were with the doctors in their individual capacities and not with

6   professional corporations.[141]  Even with respect to Dr. Kimmelmann, the listing of a professional

7   corporation on his agreement is of no consequence.  In the first place, Dr. Kimmelmann signed the

8   agreement in his individual capacity.  Moreoever, In order for plaintiff to be shielded from liability it must

9   show (1) that the professional corporation had the right to control the activities of the doctor and (2) that

10  the agreement between the professional corporation and the hospital recognized the professional service

11  corporation's controlling position.  Idaho Ambucare, 57 F. 3d at 754-755; Sargent v. Commissioner,

12  929 F. 2d 1252, 1255 (8th Cir. 1991).  Here, plaintiff offered no evidence as to whether there was a

13  written agreement between Dr. Kimmelmann or any other doctor and his or her professional

14  corproation, and if so, what their terms were.  Without such evidence, plaintiff cannot transfer the

15  employment tax liability to the professional corporation.  Dutch Square, 1994 WL *4-5.

CONCLUSION

16

17          Inasmuch as plaintiff treated a psychologist as an employee for federal tax purposes, it may not

18  avail itself of Section 530 relief with respect to the psychologists.  Even if Section 530 relief were

19  available, plaintiff offered no evidence of reliance on industry practice.  Moreover, plaintiff's general

20  counsel could not recall any discussions as to whether the psychologists should be employees or

21  independent contractors.  Nor could she recall discussing the matter with outside counsel.  Plaintiff

22  cannot establish that the psychologists are employees under the common law.  Moreover, state

23  restrictions on plaintiff's ability to employ psychologists are irrelevant.  In any event, plaintiff cannot

24

_____

25  140/  Plaintiff's memorandum at 42.

26  141/ The agreement for Dr. Meidell indicates a contract between plaintiff and the Neonatal and Pediatric intensive
27  Care Group.  Plaintiff reported the compensation paid to Dr. Meidell under his own social security number.
    LaMonna Declaration.  This indicates that plaintiff paid Dr. Meidell in his individual capacity.

28                                                          32

establish that it relied upon any such restrictions in the course of deciding to treat the psychologists as independent contractors.

As for the physicians, plaintiff does not fare much better.  Plaintiff's parent corporation, CMS, Inc., controlled the hiring of doctors at its subsidiaries.   CMS's counsel drafted the doctor's agreements or arranged for them to be drafted.  While plaintiff's medical directors were treated as independent contractors, CMS treated medical directors at two of its other subsidiaries as employees.  This inconsistent treatment creates a factual question as to whether the plaintiff actually and reasonably relied upon the bases that it asserts for treating the doctors as independent contractors.  Moreover, plaintiff has not established, as a matter of law, that it had a reasonable basis for treating the doctors as independent contractors.   Plaintiff's testimony regarding industry practice and advice of counsel is too generalized to afford summary judgment.  Moreover, plaintiff is relying on an industry practice that was largely created by the persons who decided to treat plaintiff's medical directors as independent contractors.  This type of bootstrapping is not permissible. To the extent that plaintiff is relying upon state law that limits the extent to which plaintiff is employing doctors, such state law is irrelevant. Moreover, a close reading of state law shows that these state restrictions are of no help to plaintiff if the common law factors are not met.  The doctors are so integrated into the operations of the hospital that they cannot be considered

1    independent contractors under the common law.  The conclusion is inescapable that plaintiff has not

2    shown that it is entitled to summary judgment.

3

4                                                  DAVID W. SHAPIRO
                                                   United States Attorney
5

6                                                  JAY R. WEIL (California Bar No. 75434)
                                                   Assistant U.S. Attorney
7
                                                   MICHAEL N. WILCOVE
8                                                  (D.C. Bar 359047)
                                                   Trial Attorney, Tax Division
9                                                  Civil Trial Section, Southern Reg.
                                                   P.O. Box 14198
10                                                 Ben Franklin Station
                                                   Washington, D.C.  20044
11                                                 Telephone:  (202) 514-6474
                                                   Telefax:    (202) 514-9868
12
                                                   Attorneys for the
13                                                 United States of America

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          34

1

CERTIFICATE OF SERVICE

2

IT IS HEREBY CERTIFIED that service of the foregoing Opposition to Plaintiff's Motion for Summary

3

Judgment and memorandum in opposition to said motion have been made by e-filing this 4th day of

4

February, 2002.

5

6

                                        MICHAEL N. WILCOVE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35