UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

---oOo---

KENTFIELD MEDICAL HOSPITAL CORP.,

Plaintiff,

vs. No. CV-00-C-0500-S

UNITED STATES OF AMERICA,

Defendants.

_______________________________/

Deposition of

ALEX BARCHUK, M.D.

Wednesday, May 9, 2001

SOUZA & LERSCHEN
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566

Reported by:
DEBORAH E. JILKA, CSR
License No. 5942

# INDEX

DEPOSITION OF WITNESS
WEDNESDAY, MAY 9, 2001

EXAMINATION BY: Page

Mr. Kaufman.....................................5

Mr. Cooper......................................51

## EXHIBITS

DEFENDANT EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Program Director and Staff Physiatrist Agreement | 10 |
| 2 | Second Amendment of Program Director Agreement and Staff Physiatrist Agreement (Dr. Alex Barchuk) | 43 |

BE IT REMEMBERED that, pursuant to Deposition Notice, and on Wednesday, May 9, 2001, commencing at the hour of 3:04 p.m., thereof, at the office of Kentfield Rehabilitation Hospital, 1125 Sir Francis Drake Boulevard, Kentfield, California, before me, DEBORAH E. JILKA, CSR No. 5942, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALEX BARCHUK, M.D.,

As a witness by the Defendant herein; who, having been first duly sworn, was thereupon examined and testified as is hereinafter set forth.

Law Offices of SCHNADER, HARRISON, SEGAL & LEWIS, LLP, 1600 Market Street, Suite 3600, Philadelphia, Pennsylvania 19103-7286 represented by Jeffrey Cooper, Esquire, appeared as Counsel on behalf of the Plaintiffs; and

Law Offices of UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, 555 Fourth Street, N.W., Suite 6243, Washington D.C. 20001, represented by Brian P. Kaufman, Esquire, appeared as Counsel on behalf of the Defendants.

The videographer was Jann Trudell from Souza & Lerschen, 4615 First Street, Suite 200, Pleasanton, California 94566.

# PROCEEDINGS

THE VIDEOGRAPHER: We are on the record at 3:09, May the 9th, 2001. This begins tape No. 1 in the deposition of Dr. Alex Barchuk. We are located at the offices of Kentfield Rehabilitation Hospital, 1125 Sir Francis Drake Boulevard, Kentfield, California. Case No. CV-00-C-0500-S as filed in the United States District Court, Northern District of Alabama, Southern Division. The case is entitled Kentfield Medical Hospital Corporation versus the United States of America.

My name is Jann Trudell. I'm a notary in Napa County. I work for Souza & Lerschen Court Reporters at 4615 First Street, Pleasanton, California, Suite 200. ZIP code 94566.

The attorney noticing the deposition is Mr. Kaufman on behalf of the defendant.

At this time I'd like to ask the persons to introduce themselves for the record. Please state your name, the firm you're working for and location of the firm, and whom you're representing in this matter.

MR. KAUFMAN: My name is Brian Kaufman. I'm an attorney with the United States Department of Justice in Washington, D.C. I represent the defendant, United States of America in this matter.

MR. COOPER: My name is Jeffrey Cooper. I'm with the law firm of Schnader, Harrison, Segal & Lewis, and I represent the plaintiff taxpayer, Kentfield Hospital, in this case.

THE VIDEOGRAPHER: Thank you. If there are no stipulations, the court reporter may now swear the witness.

ALEX BARCHUK, M.D.

Called as a witness, after having been first duly sworn by the Certified Shorthand Reporter to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION BY MR. KAUFMAN

MR. KAUFMAN: Good afternoon, Dr. Barchuk. My name is Brian Kaufman and I'm an attorney with the Department of Justice, Tax Division and I represent the defendant, United States of America in this matter.

Your deposition is being taken in a case of Kentfield Medical Hospital Corporation versus the United States of America, which is a case that was filed in the Northern District of Alabama in Birmingham, Alabama.

Because of that, because you are located here in California and the case is in Alabama, we are taking

your deposition by videotape because it may be necessary to use if the trial occurs in Alabama in this case.

The case involves a dispute between the defendant, United States, and the plaintiff, Kentfield Medical Corporation, which is one of the former owners of Kentfield Hospital, regarding the status or the classification of the various medical personnel at the hospital, medical directors, program directors, Chief of Staff and psychologists as independent contractors rather than just employees. And this case has resulted from that dispute between the government and the corporation.

Your deposition today is being taken under oath before a court reporter as if your testimony was being given before a court of law under penalty of perjury. Do you understand that?

A. Yes.

Q. You understand that this testimony may be used at trial as if you were actually live and participating at the trial?

A. Yes.

Q. I'm going to ask you and then Mr. Cooper as well, we are both going to ask you a series of questions related to your relationship with Kentfield Hospital and your duties as a program director at the hospital from

the time you began working at the hospital through 1995.

I understand this is a number of years ago and there may be some aspects of the questions that you don't understand. If that occurs, please state that you don't recall. Please state that you don't recall. Don't try to come up with an answer if you don't know. You don't remember is a fair statement.

Also if a question calls for a "yes" or "no" answer, please state "yes" or "no" on the record, rather than nodding so that the court reporter can pick up your response.

A. Okay.

Q. Have you had your deposition taken before?

A. Yes.

Q. Under what circumstances?

A. I do some med-legal evaluation for life care planning for spinal cord injury, so as an expert witness.

Q. Has it been in the medical context?

A. Yes.

Q. Let me have you begin by -- please state your name and spell your last name for the record.

A. It's Alex Barchuk, B-a-r-c-h-u-k.

Q. Where do you currently reside, Dr. Barchuk?

A. I reside here in Marin, San Anselmo.

Q. What is your address?

A. 255 Stuyvesant Drive, San Anselmo 94960.

Q. How long have you been at that address?

A. Two and a half years.

Q. If you could, Dr. Barchuk, just provide your medical education -- your education beginning with your college degree in the year and up through your medical education.

A. Let's see. I went to the University of San Francisco where I got a bachelor's degree in biology, and that was from the years 1987 to -- 1977 to 1981. And then I went to Georgetown Medical School in Washington, D.C. from 1981 to 1985. Came back to California and did my internship in internal medicine at St. Mary's Hospital in San Francisco, 1985 to 1986. And from 1986 to 1989, I went to Stanford Hospital residency program, and I completed it in the summer of 1989.

Q. Was it a specialized residency?

A. It was in physical medicine, rehabilitation.

Q. And after you completed your residency, what did you do after that, sir?

A. I came directly to Kentfield Rehabilitation Hospital.

Q. When did you begin working at Kentfield?

A. July of 1989.

Q. When you came to work at Kentfield, what was your position at the hospital?

A. They hired me to be the director of the spinal cord injury and trauma rehabilitation program.

Q. Did you have a formal title in that role?

A. I believe I was the director of the trauma rehabilitation program.

Q. And this was -- and this began in 1989?

A. That's correct.

Q. Were you a program director at that time?

A. Yes.

Q. How long did you remain in that position?

A. Till currently.

Q. What were the circumstances under which you came to Kentfield?

A. Well, after residency, I was looking for a job and my colleague, Dr. Doherty, I met her at a conference and told her that I was looking for work and I was graduating. And she happened to be looking for a physiatrist at that time, and she had come through my program several years before me.

Basically I was just interviewing all over the Bay Area. I wanted to stay in the Bay Area. And I came here to Kentfield. I interviewed with her and I thought it would be a great place to work and have my kids grow

up, so I accepted the position.
Q. Prior to interviewing at Kentfield, did you speak with anyone else other than Dr. Doherty?
A. No. She was my first contact person.
Q. Was there anyone else that you interviewed with at the hospital besides Dr. Doherty?
A. There was, I believe, Dennis Faulk was his name, and he worked for I believe it was Continental Medical Systems that owned the facility back then. But there was Dennis Faulk and then there was a CEO, Marsha Gibbs. I remember speaking to the two of them.
Q. Was Marsha Gibbs CEO of the hospital?
A. CEO of the hospital.
Q. And Mr. Faulk was -- where was -- was he -- was Mr. Faulk at the hospital or was he at CMS somewhere else in the country?
A. He was somewhere else in the country, but I believe he had this region.
Q. And did they formally interview you for the position?
A. Yes. I remember having a lunch interview.
Q. With both Ms. Gibbs and Mr. Faulk?
A. I remember Mr. Faulk. I'm not quite sure if Marsha Gibbs was there.
(Whereupon Exhibit No. 1 was

Page 11

MR. KAUFMAN: Let me show you what's been marked as Exhibit No. 1 for purposes of this deposition. If you could look at this document, please, and identify it.
A. This was my contract that I received the program director staff physiatrist agreement.
Q. If you look at the last page of this document, is that your signature on the document?
A. That's correct.
Q. What's the date of that signature?
A. September 23rd, '91.
Q. If you refer back to the first paragraph of the agreement, it states: "This Program Director and Staff Physiatrist Agreement is made as of this 15th day of July 1991."
Did you have a contract with the hospital corporation prior to this contract?
A. Yes.
Q. So would this have been your second contract, if you recall?
A. Yes. Or I believe it was a renewal of my first.
Q. Did you have a chance to review this contract before you came here today?
A. Briefly, briefly, yes.
Q. Was this contract the same contract as the

Page 12

first contract you entered -- the terms of this contract as the first contract that you entered with the hospital?
A. The terms was -- I believe the reimbursement was different.
Q. But otherwise, do you believe the terms were the same?
A. I believe they were the same. There was -- actually, if I could add, originally when I came here, the hospital did not have a skilled nursing unit and I believe that they added that in because I was a director of the skilled nursing unit for the time that we had it over here at Kentfield.
Q. So beginning with this contract, which is made as of July 15th, 1991, besides your being the program director of the trauma program, you also became the program director of the skilled nursing program?
A. That's correct.
Q. What was the skilled nursing program?
A. We had about a 15-bed unit right here at Kentfield, but it operated as a separate entity, so it needed a medical director. It had to have its own meetings. So I recall having to go to the meetings which I believe were quarterly. We had our own infectious disease committee. We had -- basically, we

Page 13

had to duplicate the committees of the hospital. We had our own utilization review committee, our own medical records committee. So we met as a separate entity.
Q. I'm going to ask you some more questions about that in a few minutes.
But back to the time you entered into your initial agreement in 1989, were you under that agreement, were you hired as an independent contractor of the hospital?
A. Yes.
Q. At the time you entered into that agreement, did you have any discussions regarding your status with either Dr. Doherty or any of the hospital administration as to why you were to be treated as an independent contractor rather than as an employee?
A. I don't really recall having that conversation. It just seemed like the natural thing to do. That's basically what we were used to doing. In other words, other places where I interviewed, it was all status of independent contractor.
Q. What type of hospitals were those?
A. I was offered a job at St. Mary's Hospital in San Francisco and I believe it's Seton Medical Center.
Q. Are those for-profit hospitals?
A. I believe so.

Q. Are they rehabilitation hospitals?
A. They have a rehabilitation unit within the hospital.
Q. When you entered into your original contract with Kentfield, did you have legal advice?
A. The only legal advice I think I got was Dr. Doherty read over my contract. I don't think I even hired an attorney to look through my contract.
Q. And Dr. Doherty is not an attorney in addition to her medical background, is she?
A. No.
Q. Was there an original contract presented to you by the hospital that was modified pursuant to negotiations, or did you just accept a contract that was presented to you by the hospital? Or did you propose a contract? What was the circumstance?
A. No, they gave me a contract that looked a lot like this. I remember there was some points that I had some issue with. And I think one of the points was if I was to leave the facility that I couldn't establish a practice within, I believe it was 50 miles of Kentfield for a number of years. I believe it was two years. And I told them that I don't find that acceptable because if I left the facility over here, I'd go to San Francisco and that's within the 50 miles. So I remember them

changing that part.
Q. So there wasn't a noncompete clause in that original contract?
A. There was a --
Q. There was not a noncompete clause in the original contract; is that correct?
A. I believe there still was, but I think they narrowed it down to exclude San Francisco.
Q. When you entered into the agreement that I have in front of you, was there -- was there a noncompete clause in that contract?
A. When I took a look at it just before coming over here, I didn't see one.
Q. And do you recall negotiating to have that taken out of this contract?
A. I believe so, yes.
Q. When you -- under your initial contract which you stated before began in 1989, what were your responsibilities as you understand them -- understood them to be as program director of the trauma program?
A. It's pretty much those that are spelled out in this contract. I had to basically develop the program. I had to train the staff. I had to screen patients that are coming over here. I'd have to provide medical support for the patients over here. I had to serve on

committees in the hospital, utilization review committees, infectious disease committees, things of that nature.
And basically I was here to make sure that the program would get started, would keep going, and the appropriate training was provided to the personnel over here to make it a success.
Q. Who were the -- who were the staff members at the hospital who would work in this program?
A. Well, we had the nursing staff. We had the physical therapists, the occupational therapists, the speech therapists, the nurse psychologist, dieticians.
Q. Were there any other medical doctors who were in the program?
A. No, I was responsible for the spinal cord injury program. I also provided physiatry support to the pulmonary program over here.
Q. Was that part of your original contract as well as the one that's before you?
A. No, that wasn't my original contract. Because when I first came here, there was another physiatrist over here that was involved more in the pulmonary program.
Q. So when you signed the second contract, which was made effective as of July 15th, 1991, did you take

on the additional responsibilities of staff physiatrist and as the responsibilities as program director of the skilled nursing program?
A. Right. I was the medical director of the skilled nursing program, and I provided physiatry services to the pulmonary program.
Q. Those were new responsibilities as opposed to your original contract?
A. That's correct.
Q. During the time of the contract you have before you, which began on July 15th, 1991, through the end of 1995, did you retain the responsibilities that are included in this contract?
A. Yes.
Q. Did you also have a private practice at that time?
A. I had a small private practice, yes.
Q. What percentage of your time over that period -- and if it changed, please state so -- from 1991 through 1995 did you spend in your private practice as opposed the your duties under this contract?
A. Oh, maybe about 15 percent of the time.
Q. How many hours a week would that be?
A. It was probably about, I would say, about six hours a week.

Q. And do you have a private office for that work, your private practice?
A. Currently?
Q. No, during that period, from 1991 through 1995.
A. Well, I saw the patients in the outpatient department here at Kentfield.
Q. Was that an office provided to you by the hospital?
MR. COOPER: Object to the question. He didn't say it was an office.
MR. KAUFMAN: Q. In the outpatient facility at the hospital that you saw your private patients between 1991 through 1995, did you see the patients in an office or in another type of facility?
A. No, there was office space in the outpatient department, and I would see about an hour and a half, two hours of outpatients. And it wasn't five days a week. I believe it was about three days a week. And I would physically go from here to the hospital. I'd walk over there, I'd see the patients and return back here to the hospital.
Q. Did you pay the hospital rent for use of that office?
A. Yes.

Q. Do you recall whether that was for market rent or whether you received a discount?
A. I believe it was told to me it was market rate.
Q. When you saw your patients in your private practice, did you need any therapy or nursing assistance?
A. No.
Q. For the billing for your private practice, did you do that billing yourself or was that provided to you by the hospital?
A. No, I did it myself.
Q. Did you hire a service or did you have a secretarial -- a secretary or someone -- another person to do that for you?
A. Yeah, we had another person do it for us.
Q. When you say "we," who were you referring to?
A. Well Dr. Doherty and I have the same billing person.
Q. In your role as a staff physiatrist under this contract, what were your responsibilities?
A. Well, the ones that I stated earlier is basically to be the program director of the spinal cord injury program, to provide physiatry support for the pulmonary program and work in the skilled nursing unit.

And that entailed being here every day and screening the patients that came in, providing them with the history and physical and then seeing them on a daily basis throughout the day.
Q. For the staff physiatry position where you provided support for the pulmonary program, what did that entail?
A. Anyone with a diagnosis of any kind of pulmonary problem that came in, I focused on those individuals. So I do the history and physical. I would get the necessary labs and I would see them on a daily basis and work with the pulmonary director who was Alan Margolin.
Q. So you were -- in that position you were actually seeing patients?
A. Yes, that's correct.
Q. And if you can quantify between 1991 and 1995, what percentage of your time was in that role as opposed to in the two program director roles that you had as far as patient care responsibilities?
A. I would say it was about a third of the time.
Q. Who took care of the billing for the patients that you saw in that position?
A. The same billing person as my outpatient practice.

Q. Were you paid -- so you were paid -- so you were -- were you paid -- strike that.
So the hospital did not reimburse you under the agreement for the -- under the agreement before you for the patients you saw in the staff physiatrist position; is that correct?
A. That's correct.
Q. Did those -- under your -- let me have you take a look at your contract.
Refer to page -- it's going to be Page 5 of your contract, Section 2.7 states:
"The Physician agrees that he shall devote no fewer than 36 hours per week, no less than 48 weeks per calendar year to the performance of the services other than those described in subsection 2.1(c) during the terms of this Agreement."
Was the time that you provided physiatry support to the pulmonary program counted towards those 36 hours?
A. To tell you the honest truth, I don't know.
Q. The payment you were made -- let me have you refer -- it's going to be -- I don't believe there's a page number at the bottom but it's the 8th page of the agreement. Section 5.2 states:

"The Physician shall be compensated at the rate of Five Thousand Dollars per month for the administrative services he performs hereunder. The Physician shall document the time he spends providing professional and administrative services in the Program in accordance with Medicare guidelines and as may be required by the fiscal intermediary, and shall provide the Hospital with copies of such documentation on a monthly basis."

Q. Did you provide any administrative services in your physiatrist support for the pulmonary program?

A. Well, I remember I would have to keep the program a success, meet with the respiratory therapists. I had to provide some continuing education in the pulmonary rehabilitation. I gave grand rounds on it several times. So it's part of the marketing of the program I remember I was involved in.

Q. And was that time that you could bill directly to patients, or was that time that you couldn't personally bill to patients?

A. That's correct. That was independent of the billing.

Q. So would that -- so your reimbursement for that time spent, would it be fair to say that was

Page 23

part of that monthly payment, that $5,000 per month payment that you were receiving under this agreement?

A. I would say yes.

Q. In your role as the staff physiatrist and in support in the pulmonary program, what interaction do you have with Alan Margolin, who's the program director in that program?

A. I remember us doing some lectures together. Every pulmonary patient that would come in through the door I would screen, and then Dr. Margolin would screen also because we had very heavy patients. And part of the pulmonary program was the ventilator-weaning program.

So he would be in direct contact with the referring physician. And the bottom line is he would accept the patient. The patient would come in through the door, I'd provide the history and physical, and then he would provide with a pulmonary consult. And then I would see the patient on a day-to-day basis.

Q. Did he supervise your medical work?

A. Sure, yes.

Q. Did you consult with him before making medical decisions on the patients that you saw?

A. If they were complicated problems, yes.

Q. Were there therapists who worked in the

Page 24

pulmonary program?

A. The therapist here at the hospital, I don't recall having one separate pulmonary team.

Q. In your role as the -- in the staff physiatrist role in that program, did you supervise the therapists in the way they saw the patients in the program?

A. Yes.

Q. What type of supervision would that be?

A. Well, being here most of the day, I'd go to the gym and I would see them performing their physical therapy or occupational therapy. And I'd make sure that they checked the individuals' oxygen saturations. I'd make sure they knew the appropriate pulmonary precautions.

I'd meet with them on a weekly basis. We would go over all the cases and I would update them medically what's going on with the patient, what I'd be worried about, how much to push them, how little to push them. So basically I'd kind of fine tune the team not to overwork the individual that came in and that way they would know medically what's going on with them pretty much on a day-to-day basis, but I formally met with them once a week.

Q. What type of therapists would work in that

Page 25

program?

A. Physical therapists, occupational therapists. All the ventilator patients had a speech therapist. A nurse psychologist would sometimes be called, not all the time, and the nursing and the respiratory therapists.

Q. Would you provide supervision to the neuropsychologists or the nursing staff as well?

A. They would come to the meetings, and during the meetings I would update everybody on the medical situation, how long I thought from a medical perspective the individual would be here. And then everybody would give their feedback and we would come up with a rehabilitation plan.

Q. Did you provide any medical training to either the therapists, the neuropsychologists or the nurses in your role as a physiatrist in the pulmonary program?

A. Yes.

Q. And what type of training would that be?

A. I remember giving some in-services to the staff, and I would also make sure that everybody knew the Medicare guidelines for what's appropriate for acute pulmonary rehabilitation and make sure that everything was documented under those guidelines.

Q. Did you do any interviewing for the therapists

or the neuropsychologists that worked in that program? And again, I'm referring to the pulmonary program.

A. No. I don't recall.

Q. Do you recall whether Dr. Margolin did any interviewing for those positions?

A. I believe he did, particularly with hiring of, say, a respiratory therapist.

Q. Do you know who was responsible for making the hiring decision for those therapists?

A. No.

Q. In your role as the staff physiatrist in the pulmonary program, did you do any community outreach work, either to bring in additional patients or to bring in additional staff?

A. I remember going to some hospitals and providing them with in-services to pulmonary rehab. I don't believe I gave any lectures specifically to the community on pulmonary rehabilitation. I recall going and giving grand rounds to several hospitals on pulmonary rehabilitation. And whenever case managers would come from other facilities, I would always make sure that I was involved with the tour so I could explain the program and what type of patients were comfortable taking things of that nature.

Q. Again, in your position as physiatrist in the

pulmonary program, did you require medical equipment to see the patients?

A. Just my stethoscope.

Q. Did you provide that stethoscope yourself or did the hospital provide that for you?

A. I remember buying my first stethoscope. I've used some of the hospital's stethoscopes, especially if I forget mine and they are laying around. I just pick it up and use it. I mean, the hospital did provide some stethoscopes that I've used.

Q. And was it your -- were you -- the therapist, the neuropsychologist -- the therapist and the nurses who worked in the pulmonary program, were you aware of whether they were contractors for the hospital or employees of the hospital?

A. I assume they were employees of the hospital.

Q. So you didn't pay those therapists yourself out of the -- or the therapists or nurses yourself out of the stipend you were receiving from the hospital?

A. No.

MR. COOPER: Objection.

MR. KAUFMAN: Q. Let me shift to your program director responsibilities as part of the -- I believe you said it was the spinal injury program. I know that the contract in front of you lists a number of different

responsibilities, but in your own words can you summarize what your responsibilities were as the program director for that program from 1991 through 1995?

A. Again, it was to make sure that there was an appropriate spinal cord injury team, that they knew what they were doing, to make sure people were getting the appropriate continuing medical education on the topic, to make sure that we received the appropriate type of patients, that the appropriate care was provided to them, and also the marketing aspect of the whole thing.

Q. What type of --

A. Excuse me. And also to make sure that it was a successful program. We would rate the program and make sure that we are doing well.

Q. Did therapists work in that program?

A. Yes.

Q. What type of therapists?

A. Physical therapists, occupational therapists, some speech therapists, neuropsychologists, nursing, the rehab. team.

Q. Did you participate in the hiring process of any of those therapists?

A. I remember I interviewed some physical therapists. We don't have a very big turnover over here. So therapists, when they come, they usually stay

for a number of years. But I remember a therapist leaving -- it was actually an occupational therapist, and the new person that came in, I did interview and ask questions, how familiar she was with spinal cord injury and things of that nature.

Q. Do you know who else interviewed those therapists?

A. I can't give you specific names, but whoever the director of the therapy program at that time was, I'm sure interviewed them. I don't recall if Dr. Doherty interviewed them. And the rest I'd be assuming. I'm assuming the CEO and the human resources person interviewed them, but I was never there to witness that.

Q. In your role as director of the spinal injury program, were you provided an office by the hospital?

A. Yes.

Q. Were you provided a -- did you utilize that office?

A. Yes.

Q. Were you provided secretarial support?

A. Yes.

Q. Did you have your own secretary or did you share a secretary?

A. I shared a secretary.

Q. Were you provided office supplies?

A. Well, the only supplies I really needed was some books. And I remember in the good old days we got some books if -- we got reimbursed for some of the books that we got specifically for this type of program. And I remember having some conferences paid -- again, in the good old days.

Q. When you refer to the "good old days," did that period include 1991 through 1995?

A. I believe I went to some conferences specifically on spinal cord injury that I was reimbursed in the early '90s.

Q. Who reimbursed you?

A. The hospital did.

Q. And were you attending those conferences in your role as the program director for spinal injury?

A. Yes.

Q. In your position as program director for spinal injury, did you need to use paper or to make copies?

A. Yes.

Q. And did you provide that yourself or did the hospital provide you the paper and the copy machines?

A. No, the hospital provided that.

Q. Was there any other office materials besides

that that were provided to you?

A. I remember when I would do a presentation, the hospital would reimburse me if I made slides and things of that nature, and they would provide me with the projector when I'd go out and do the talks. But there was really not that much specialized equipment that we used.

Q. Did the hospital -- again, I'm talking between 1991 and 1995 -- reimburse you for your travel expenses when you went out and gave talks?

A. I don't remember them doing that, no.

Q. And again, with respect to your position as program director for spinal injury, what type of talks would you give and where would they be?

A. Well, they would be to the local hospitals over here, again in the form of grand round. I would give talks to case managers. I would give talks to physical therapists. I gave some local talks over here that I believe were open to the community.

Q. What was your interaction with Dr. Doherty who was the medical director for the hospital in your role as program director for spinal injury?

MR. COOPER: Objection.

MR. KAUFMAN: You can answer.

A. Basically the interaction was when I was off

of call and she was covering. I'd make sure that she knew my patients and who they were. And we would meet and talk things over, how things were going, whether everything was going okay with the program. I remember particularly when I first started off -- that's really about it.

Q. Did she supervise you in your role as program director for spinal injury?

A. When I first came here, everybody -- in order to get privileges to be on the medical staff, I had to have a supervising physician, and she did supervise me initially on my history and physicals and my progress notes and things like that until I got all my privileges. So it was only in the very beginning. After that, no.

Q. Would you -- do you have any interaction in your role as program director of spinal injury with the other program directors at the hospital?

A. With Dr. Doherty.

Q. Other than Dr. Doherty, the other program directors, such as Dr. Davidson or Dr. Margolin?

A. I did have interaction initially when Dr. Davidson first started his fibromyalgia clinic here in the outpatient department. He knew me and he called me and said he was interested in this, and I helped

facilitate that whole interaction.

With Dr. Margolin, I talk to him probably three or four times a week, and he would come over here and I'd meet and talk to him about cases and things of that nature.

Q. Did you see patients in your role as director of the spinal -- in your role as the program director of the spinal injury program?

A. Yes.

Q. How are you reimbursed? Were you reimbursed under this contract for seeing those patients or did you bill them separately?

A. I billed them separately for my patient visits.

Q. What that -- was that time seeing patients allocated towards the 36 hours per week that you were required to satisfy under this agreement? And again, I'm referring to the agreement which is Exhibit No. 1.

A. That was separate.

Q. That was separate.

So were those 36 hours a week that you were required to satisfy all hours that you couldn't personally bill for the patients; is that correct?

A. That's correct.

Q. In your role as program director for the

spinal injury program -- first, in your contract, it refers to your position of program director with the trauma program. Is that the same program as the spinal injury program?

**A. Yes.**

Q. How was the budget for the program determined?

**A. That's a very good question. I don't know. I would tell the CEO and Dr. Doherty if I needed some supplies such as an electric wheelchair or things of that nature. I would make periodic requests for certain equipment. And then it would go to the powers that be.**

Q. Would those requests be made to Dr. Doherty or someone in the hospital administration or to both?

**A. Well, I always kept Dr. Doherty in the loop since she's medical director, but the requests were made to the hospital administration.**

Q. Besides that budget issue, did you have any other contact with the hospital administration in your role as program director for spinal injury?

**A. I had a contact with the marketing team. They would set up talks for me and things of that nature. So from a marketing perspective, I had quite a bit of contact with the marketing director at the time. And then I would occasionally have contact if, again, I wanted to order some equipment or have requests for some**

**equipment. Other than that, that was about it.**

Q. If you'd refer to the last page of the contract that's in front of you, the contract was signed on behalf of Kentfield Hospital Corporation by Anthony Misitano.

Do you know who Mr. Misitano was?

**A. Yes.**

Q. Did you have any contact with Mr. Misitano in your role as a program director for the spinal injury program?

**A. Not really. I would come every once in a while to see how the hospital was doing.**

Q. What did you understand to be his role with respect to the hospital?

**A. Well, it was a tier system. And there was the CEO, there was regional director, and he was above the regional director. And I knew that he had to sign off on the contracts when we renewed the contracts.**

Q. When you began with Kentfield Hospital, what was your understanding of the relationship between Continental Medical Systems and the hospital?

MR. COOPER: Objection.

MR. KAUFMAN: You can answer.

**A. I believe they were the owners of the hospital.**

Q. Did you attend any -- I know you partially answered this earlier, but do you recall attending any medical conferences in your role as program director for spinal injury?

**A. Yes.**

Q. Again, those -- during the period of 1991 through 1995, were any of those -- your attendance in any of those conferences reimbursed by the hospital?

**A. Yes.**

Q. Did they fully reimburse you or did they pay a portion?

**A. I believe they paid a portion.**

Q. In your role of program director for the spinal injury program, do you know of any responsibility for disciplining any of the staff that worked in the program?

**A. No. If there was a staff that I was worried about -- particularly a nursing staff, I'd go to the director of nursing and tell them that I was concerned about a certain individual.**

Q. Let me shift now to your role as the program director for skilled nursing.

You had mentioned before that the hospital -- that that program was not in existence at the time you began at Kentfield; is that correct?

**A. That's correct.**

Q. Do you know, did the program begin prior to the date on the agreement you have before you?

**A. I believe so.**

Q. Were you the first program director for skilled nursing or did you have a predecessor?

**A. No, I was the first.**

Q. And again, if you could just state what you're responsibilities were as the program director for skilled nursing.

**A. The skilled nursing facility basically worked as a separate entity within the hospital. So it had to have its own committees. I had to serve on those committees. We had to do separate reports from the hospital as far as infectious disease, record reviews, utilization review, pharmacy. All that had to be separately documented. And I believe we met on a quarterly basis and would review all of that.**

**I also, when the patients were referred here to Kentfield, would go over with the admissions department who I felt was more appropriate for the skilled nursing unit versus the acute rehabilitation unit.**

Q. Did Dr. Doherty as medical director also have responsibility over the skilled nursing unit?

A. Yes, because it was within the hospital, yes.
Q. Who were the staff who worked in the skilled nursing unit?
A. It was the regular staff of the hospital and it was -- we just designated one of the wings of the hospital as the skilled nursing.
Q. Would that staff also work in the other units of the hospital or just in skilled nursing?
A. They would work in other areas. I recall some nurses working the majority of the time with the skilled nursing patients, but I believe they alternated.
Q. Was the skilled nursing unit in place between 1991 and 1995?
A. I believe so, yes.
Q. Is it still in place at the hospital?
A. No.
Q. In your position as program director of the skilled nursing program, did you have a separate office or was it the same office you had as program director for the spinal injury?
A. It was the same office.
Q. In terms of the secretarial support, was it the same individual or did you have a separate secretary?
A. It was the same individual.

Page 39

Q. Do you require any additional office supplies in your role as program director for skilled nursing?
A. No.
Q. So the office supplies would have been the same, paper and copying, as you would have had in your other program director role?
A. Yes.
Q. Again, that was provided by the hospital?
A. Yes.
Q. Did you attend any conferences in your role as program director for skilled nursing?
A. I don't recall.
Q. Did you do any marketing on behalf of the hospital for that program?
A. It was more indirect marketing. I don't ever remember going and giving a talk on our skilled nursing unit. But, again, when managers or families would come through, I would mention to them that there's a skilled nursing unit at the hospital and how we utilized that in the context of the acute rehab. hospital.
Q. Did neuropsychologists work in the skilled nursing program?
A. I believe so, yes.
Q. What type of therapists would have worked in that program?

Page 40

A. The same therapists as the acute rehab: Physical therapists, occupational therapists, speech therapists.
Q. And nurses would have also worked in that program?
A. That is right.
Q. Did you supervise those staff members in your role as program director of skilled nursing?
A. Yes.
Q. Was that supervision similar to your other program director supervision role as program director for spinal injury?
A. Yes.
Q. In terms of proposing a budget and -- do you have that responsibility as program director for skilled nursing?
A. No.
Q. Who would propose a budget for that unit?
A. Somebody from the administration, I guess.
Q. If you -- were you responsible for requisitioning supplies for the skilled nursing unit if they were necessary?
A. Well, the supplies were pretty much the same as the acute hospital. There wasn't really anything that different that we needed on the skilled nursing unit.

Page 41

Q. Did you see patients in the skilled nursing units?
A. Yes.
Q. Were there any other physicians who saw patients on that unit?
A. Yes.
Q. Who were those physicians, if you can recall?
A. Well, Dr. Doherty saw patients. And back in the early '90s, there was -- Alan Kimelman was here. He was a physiatrist. And then after him, there was David Padgett who was here for a little bit of time. And after that was Michael Post who was here for a period of time. And that's all in the early '90s.
And then Dr. Fecker came, but I think that was after '95.
Q. What type of interaction did you have with the physicians who were working the skilled nursing program in your role as program director?
A. Just patient coverage, patient care type of things. If I was on call, they would sign out and I would see the patients on the skilled nursing unit.
Q. And the skilled nursing unit, do you provide training to the therapists, the neuropsychologists and the nurses who work in the unit?

A. **No.**
Q. Do you know where they -- did they need specialized training to work in that unit?
A. **No. It was really part of the acute rehab. facility. What they did need training on, was the different requirements of a skilled nursing unit. Because I remember to be licensed as a skilled nursing unit, it had to be -- there's different requirements for that facility, and that -- the information for that was provided by the hospital administration over here.**
Q. So you -- did you provide any of that training?
A. **Well, I provided the medical piece. Again, mostly it was education as to who's the appropriate patient in the skilled nursing unit and the degree of medical complexity that should be on that skilled nursing unit, so it was more from a medical perspective.**
Q. When you saw patients in the skilled nursing unit, how were those patients billed?
A. **I billed them directly.**
Q. So any reimbursement you received under the contract before you for your role as program director, skilled nursing, was just for the administrative aspects of your role; is that correct?
A. **That's correct.**

Q. Between July 1991 when this agreement before you took effect, the agreement which is Exhibit No. 1, and the end of 1995, did any of your responsibilities at the hospital change?
A. **Not that I can recall.**
MR. KAUFMAN: I'm going to show you what's been marked as Exhibit 2. If you could take a look at this document and identify it please.
(Whereupon Exhibit No. 2 was marked for identification.)
A. **Second amendment of program director agreement and staff physiatrist.**
MR. KAUFMAN: Q. Do you recall whether there was a first amendment? Let me first ask you, Dr. Barchuk. Is that your signature on the second page of this document?
A. **Yes.**
Q. And what was the effective date of this document?
A. **March 1st, 1994.**
Q. The document refers to -- the second paragraph of the document states:
"Hospital and Doctor entered into that certain Program Director and Staff Physiatrist Agreement dated July 15, 1991 (the 'Program Director Agreement and Staff

Physiatrist Agreement') which agreement was amended on July 16th, 1992 (the 'First Amendment'), the Program Director Agreement and Staff Physiatrist Agreement and First Amendment collectively referred to as the Agreement."
Do you recall that first amendment occurring? There isn't a copy before you.
A. **Do I recall the document? No.**
Q. Okay.
If you look further down in this document, it states in the paragraph which begins with No. 2:
"The first sentence of Section 5.2 of the Agreement (Section 5 entitled 'Billing and Compensation') is hereby amended as follows: The Physician shall be compensated at the rate of $8,333.33 per month for the administrative services he performs hereunder."
Do you recall that the amount you were paid under the contract was increased?
A. **Yes.**
Q. Do you recall why that amount was increased?
A. **I remember we had to do some legal work. I remember having to go in front of the administrative law**

**judge on a number of cases that was under review with regards to the appropriateness of the patient being here at Kentfield. So I recall that taking quite a bit of time.**
Q. Do you understand that to be the reason why your agreement was increased from its previous amount to the amount in this amendment?
A. **Well, I probably asked for more money also. And things were going well with the programs, so I asked for more money.**
Q. The paragraph above that in the agreement, just paragraph No. 1 in this amendment to the agreement states:
"Section 2 of the Agreement entitled 'Duties of the Physician' shall be amended to include the following: 2.11. Preparation for and attendance at Administrative Law Judge hearings."
A. **Yes.**
Q. Was that what you were referring to?
A. **Yes.**
Q. What were your responsibilities in that regard?
A. **To argue to the administrative law judge why a patient would be an appropriate rehabilitation**

candidate.

Q. And was that time consuming?

A. Yes.

Q. Had you done that -- do you recall when you began -- you began doing that task?

A. I don't recall the year, but it was somewhere right around that time because this was added to the contract.

Q. And were you reimbursed for that time under the contract or was that time that you could separately bill to someone?

A. No. This was all included in this stipend.

Q. Under your agreement, did the hospital provide you with any insurance in your role either as the staff physiatrist for the pulmonary program, program director for the spinal injury program or the program director for skilled nursing?

A. Initially when I first came here, I remember in my initial contract I did get provided with some medical insurance, and that didn't last too long and I can't recall exactly how long that lasted, maybe six months to a year. And then basically the administration said that you need to get your own insurance. So then basically I had to get my own medical insurance, dental insurance.

Q. Prior to that time -- prior to that change in policy you just described, what type of insurance did you receive from the hospital?

A. When I initially came here in 1989?

Q. Yes.

A. They did provide me with some medical insurance.

Q. Did you receive any life insurance or any other -- any type of pension plan or any of those type of benefits?

A. No.

Q. Do you recall when you stopped receiving health insurance from the hospital?

A. If I was to guess, I believe I received it for maybe a year period of time when they basically said that I need to get my own insurance.

Q. Is it fair to say that you wouldn't have been receiving any insurance from the hospital from the effective date of the agreement which is marked as Exhibit 1, which was July 15, 1991?

A. That's correct.

Q. In your role, in your three-part role that's described in this contract, did you have any contact with any medical directors or program directors from any other hospitals that were in the CMS system?

MR. COOPER: Objection.

A. I never really went to like directors' meetings and things like that. The only contact I had was if I went to continuing education courses where I would see my friends and other program directors.

MR. KAUFMAN: Q. What kind of continuing education courses would you attend?

A. Mostly to do with spinal cord injury.

Q. Where would those be?

A. Oh, they were all over. The American Academy of Physical Medicine and Rehabilitation has a yearly course. The American Spinal Cord Association has a yearly course. So through the years, we would try to get to the Academy meetings once a year, and you meet all the people that you got to residency with and other individuals, so that it was an informal type of contact.

Q. Who would pay for that training?

A. Well, initially when I was over here, I did get reimbursed some to go to these continuing education courses.

Q. And did that reimbursement change at some point?

A. It did.

Q. Do you recall when?

A. I can't tell you when, but it was -- the

budget got tighter and tighter I remember, and I remember having to basically pay for my own continuing education courses. But I can't tell you the year.

Q. Was it prior to 1995?

A. I believe so.

Q. Between the time you entered into your first agreement with CMS in 1989 and the end of 1995, did you have any discussions with anyone -- excuse me, the agreement, which is the first agreement. The agreement -- your first agreement with the hospital.

Did you have any discussions with anyone from the hospital or from CMS regarding your status as an independent contractor to the hospital rather than as an employee?

MR. COOPER: You're talking about the agreement with Kentfield?

MR. KAUFMAN: With Kentfield.

MR. COOPER: You said the agreement with CMS.

MR. KAUFMAN: I meant to correct myself.

Q. Did you have -- let me ask you this: Your first -- the first agreement that you've been referring to that you entered into in 1989, that was an agreement with Kentfield Hospital and not with CMS; is that correct?

A. That's correct.

16:19 Q. And the agreement in front of you marked as Exhibit 1, that's also an agreement with Kentfield Hospital?

16:19 **A. That's correct.**

16:19 Q. From the time you entered into your first agreement with Kentfield Hospital until the end of 1995, roughly a six-year period, did anyone from either Kentfield Hospital or from CMS discuss the issue of your character -- your classification as an independent contractor of the hospital rather than as an employee with you?

16:19 MR. COOPER: Objection.

16:19 **A. Well, initially when I came over here, they pretty much told me that I was an independent contractor and I had to provide myself with malpractice insurance, with my own life insurance, my own benefits.**

16:19 MR. KAUFMAN: Q. Were there any additional discussions in any later years on that issue?

16:20 **A. I don't believe so.**

16:20 Q. Between 1989 and 1995, did you have a professional corporation?

16:20 **A. No.**

16:20 Q. So payments you received under your agreements with the hospital were made directly to you; is that correct?

16:20 **A. That's correct.**

16:20 MR. KAUFMAN: I don't have anything else.

EXAMINATION BY MR. COOPER

16:20 MR. COOPER: Q. Good afternoon, Dr. Barchuk my name is Jeffrey Cooper. I represent the hospital. I have just a few questions for you. Some of them may be -- since I'm going second, a little duplicative of what you've been asked, but I assure you we can get through it much quicker.

16:21 I just want to review briefly your educational background. As I understand it, you received a bachelor's degree in 1981 from the University of San Francisco?

16:21 **A. That's correct.**

16:21 Q. And your medical degree from Georgetown University in Washington, D.C. in 1985?

16:21 **A. That's correct.**

16:21 Q. You then spent a year as an intern at St. Mary's Hospital in San Francisco and did your residency in physical medicine and rehabilitation at Stanford University completing that in 1989?

16:21 **A. That's correct.**

16:21 Q. And then after completing that residency you came here to Kentfield Hospital; is that right?

16:21 **A. That's correct.**

16:21 Q. As I understand it, Doctor, for -- as a physician, you had to seek staff privileges at Kentfield; is that right?

16:22 **A. That's correct.**

16:22 Q. And during the period from when you first arrived until your staff privileges were officially conferred, there had to be some other -- some other physician on staff who oversaw what you were doing; is that correct?

16:22 **A. That's correct.**

16:22 Q. And that's part of the medical staff bylaws with respect to how physicians operate until they are on staff; is that right?

16:22 **A. That's correct.**

16:22 Q. And just so we are clear, the medical staff bylaws are promulgated by the medical staff and that's separate from the administration of the hospital; is that right?

16:22 **A. That's correct.**

16:22 Q. Once you joined the staff, I take it then as a member of the staff and as a licensed physician, the manner in which you practiced medicine was up to you? You practiced medicine as you saw fit and as your patients needed; is that correct?

16:22 **A. That's correct.**

16:22 Q. Now, you understood that when you contracted with Kentfield that you were an independent contractor; is that right?

16:23 **A. Yes.**

16:23 Q. And your compensation was paid to you in periodic lump sums without deductions for federal tax withholdings or Social Security tax; is that right?

16:23 **A. That is right.**

16:23 Q. Now, can we understand that the income which you received was appropriately reported by you in consultation with any advisors you might have had on your annual federal tax return and that the required taxes were paid on that income?

16:23 **A. That's correct.**

16:23 Q. Everybody smiles when I ask that question a little bit because everybody pays their tax it seems.

16:23 In your various positions as director of programs or as the staff physiatrist, is it fair to say that based on your knowledge and experience, you pretty much knew what needed to be done in order to develop a program and you didn't need someone from the administration to tell you to spend X numbers of hours in community outreach or Y number of hours in talking to other physicians or Z number of hours in training staff,         

but that you used your own discretion as to how to allocate your time?

**A. That's correct.**

Q. And there was no one from Kentfield directing the means or manner in which you performed your services both as a physician and in your capacity as program director -- as a program director or a physiatrist?

**A. That's correct.**

Q. Now, Doctor, the fact that you would -- I smile when I ask this question. The fact that you would occasionally use a stethoscope from the hospital rather than your own stethoscope, or the fact that the hospital would supply stationery for the necessities of you being a program director here, did any of that make you feel that the hospital was controlling the manner in which you were performing the services that you contracted to provide?

**A. No.**

Q. So by providing those items to you, you didn't feel like you were restricted or controlled in any way in what you had agreed to do?

**A. That's correct.**

Q. And you were still able to do it in the way that you thought was the most appropriate?

**A. That's correct.**

Q. You were paid under your contracts a stipend on a periodic basis and I think in your contract it sets forth the annual amount and says that it's to be paid monthly; is that correct?

**A. That's correct.**

Q. And your contract generally requires that you account for at least 35 hours a month in your various positions; is that right?

**A. Or was it 38?**

Q. It was actually 36. Paragraph 2.7.

**A. 36 hours. That's correct.**

Q. In deciding what to do in those 36 hours, you yourself, based on your assessment of what was appropriate and what needed to be done to fulfill the goals set forth in the contract, decided how to use those 36 hours; is that right?

**A. That's correct.**

Q. And if it was necessary in a week for you to spend 40 hours or 45 hours, you still received the same amount of stipend; you didn't get more money because it took more time to achieve the goals which were set out in the contract?

**A. That's correct.**

MR. COOPER: Doctor, those are all my questions. Thank you. I told you I'd be brief.

THE WITNESS: Thank you.

MR. KAUFMAN: Nothing else from me. Thank you, doctor.

THE VIDEOGRAPHER: Going off the record now at 4:28. This ends Tape 1 in the deposition of Dr. Alex Barchuk. This concludes the deposition.

We have used one video tape. The master tape will be maintained at the offices of Souza & Lerschen Court Reporters in Pleasanton, California. And we are off the record at 4:28.

(Whereupon at 4:28 p.m. the deposition of ALEX BARCHUK, M.D. was concluded.)

________________________

ALEX BARCHUK, M.D.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ____________ ________________________

ALEX BARCHUK, M.D.

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )

COUNTY OF SONOMA )

I, Deborah E. Jilka, Certified Shorthand Reporter in and for the State of California, do certify:

That ALEX BARCHUK, M.D., the witness in the foregoing deposition was by me first duly sworn to testify to the truth in said cause;

That said deposition was reported at the time and place therein stated by me, CSR No. 5942, and thereafter transcribed under my direction; after which, the witness was afforded the opportunity to read, correct, and sign the deposition;

That if unsigned by the witness, the witness shall not have availed himself of the opportunity to sign, or signature has been waived.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, or to their respective counsel.

IN WITNESS WHEREOF, I hereunto set my hand this 23rd day of May, 2001.

________________________

DEBORAH E. JILKA, CSR No. 5942

SOUZA & LERSCHEN
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566
(925) 846-8631

May 23, 2001

Alex Barchuk, M.D.
Kentfield Rehabilitation Hospital
1125 Sir Francis Drake Boulevard
Kentfield, California

Re: KENTFIELD MEDICAL HOSPITAL CORP. vs. USA
Taken on Wednesday, May 9, 2001
Reported by Deborah E. Jilka, CSR No. 5942.

Dear Dr. Barchuk:

Pursuant to the Federal Rules of Civil Procedure Rule No. 30(e), you are advised that the original transcript of your deposition taken in the above-entitled action is available for your reading, signing, and the making of such corrections that you may deem necessary.

You have thirty (30) days following receipt of this letter to read, correct and sign your deposition. ANY CHANGES IN FORM OR SUBSTANCE THAT YOU MAKE MUST BE ACCOMPANIED WITH A STATEMENT OF THE REASONS FOR MAKING THEM.

Should you have any questions regarding this procedure, please consult with your attorney or contact our office.

Sincerely yours,

Deborah E. Jilka, CSR

Cc: All counsel