Jeffrey Cooper (PA ID. No. 21181) (*Pro Hac Vice*)
Alexander S. Helderman (PA ID. No. 84390)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
(215) 751-2096
(215) 751-2205 (Facsimile)

**Attorneys for Plaintiff**
**Kentfield Medical Hospital Corp.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENTFIELD MEDICAL HOSPITAL CORP., | ) |
| Plaintiff, | ) |
| | ) NO. C-01-2989 (VRW) |
| v. | ) |
| | ) **SECOND REPLY BRIEF IN** |
| UNITED STATES OF AMERICA, | ) **SUPPORT OF KENTFIELD** |
| | ) **MEDICAL HOSPITAL** |
| Defendant. | ) **CORP.'S MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| | ) |
| | ) (Fed. R. Civ. P. 56) |
| | ) |
| | ) Date: May 23, 2002 |
| | ) Time: 2:00 P.M. |
| | ) Courtroom: 6 |
| | ) Judge: Vaughn R. Walker |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................. 1

ARGUMENT ..................................................................... 1

    I.    KENTFIELD IS ENTITLED TO RELIEF UNDER SECTION 530 OF THE REVENUE ACT OF 1978 ............................. 1

        A.    Kentfield Has Met The Substantive Consistency Requirement Of Section 530 .............................. 1

        B.    Kentfield Has Met The Reporting Requirement Of Section 530 ............................................ 5

    II.    KENTFIELD IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PSYCHOLOGISTS WERE PROPERLY TREATED AS INDEPENDENT CONTRACTORS UNDER THE APPLICABLE COMMON LAW RULES .................... 7

CONCLUSION .................................................................... 9

# INTRODUCTION

Kentfield Medical Hospital Corp. ("Kentfield") has satisfied the only requirements of Section 530 of the Revenue Act of 1978 left at issue in this tax refund action: (1) the substantive consistency requirement, and (2) the reporting requirement. Kentfield's brief treatment of James Wilson, Ph.D. as an employee does not disrupt either requirement. The Defendant United States of America's position to the contrary contravenes the policy of Section 530 and is inconsistent with the evidence as well as the language of Section 530. Moreover, Kentfield properly treated the Psychologists as independent contractors under the applicable common law rules, and the United States has failed prove otherwise.

# ARGUMENT

## I. KENTFIELD IS ENTITLED TO RELIEF UNDER SECTION 530 OF THE REVENUE ACT OF 1978.

### A. Kentfield Has Met The Substantive Consistency Requirement Of Section 530.

In its Response brief, the United States does not contest that Kentfield began treating Dr. Wilson as an independent contractor shortly after the acquisition of the hospital based on Kentfield's good faith belief that such treatment was necessary to comply with California law. The United States does not offer any evidence to suggest that Kentfield's decision was made for any other reason. Accordingly, the United States concedes that Kentfield acted in a manner consistent with the policy and purpose of Section 530.

Nonetheless, the United States still contends that Kentfield is not entitled to Section 530 relief because of the substantive consistency test. This position is contrary to the clearly expressed legislative history and the intent of Section 530.

The purpose of Section 530 is to protect taxpayers who in good faith treated their workers as independent contractors. *See General Inv. Corp. v. United States*, 823 F.2d 337, 340 (9th Cir. 1987). The substantive consistency requirement is as an anti-abuse provision designed to prevent relief to taxpayers who converted workers solely to take advantage of Section 530. H.R. Rep. No. 95-1748. The United States does not contest that Dr. Wilson's conversion was made in good faith and not for the purpose of taking advantage of Section 530. Because Kentfield's decision to treat Dr. Wilson as an independent contractor is consistent with Section 530, Dr. Wilson's brief employment should not be used to "punish" Kentfield for, in good faith, correcting a mistake made by its predecessor.

Even the IRS has determined that the brief treatment of a single individual as an employee should not be used to deprive a taxpayer Section 530 relief, particularly when the circumstances do not suggest the conversion was made to take advantage of Section 530 - - the same argument made by Kentfield. Litigation Mem., 1990 WL 1086223 at 5 (1990)

(Attach. B. to Pl.'s Mem. P & A).[1] The Court should follow the IRS's own guidelines and rule that the substantive consistency requirement is satisfied.

Even if Dr. Wilson's brief treatment as an employee runs afoul of the substantive consistency test, Kentfield has satisfied the test with respect to all other Psychologists because the role fulfilled by Dr. Wilson as the Director of Psychology was different from the other Psychologists. The United States, however, contends that it "is not clear that Dr. Wilson always served as a director of psychology during the time he was an employee" and that his role was similar to that of the other Psychologists. The evidence proves otherwise.

Although Dr. Wilson may not have been formally appointed Director of Psychology immediately after he was retained, he contracted with Kentfield for that purpose. Indeed, even at the commencement of his relationship with Kentfield, Dr. Wilson was considered "the director of the department." (Wilson Dep. at 23:15-16, Ex. 1). In this role, Dr. Wilson "develop[ed] the program, the head injury program, psychological side and behavioral side in terms of treatments and services." (Wilson Dep. at 23:10-13, Ex. 1). Accordingly, whether Dr. Wilson had the official title as "Director" when he first arrived at

---

[1] The United States cites *Halfhill v. United States*, 927 F. Supp. 171 (W.D. Pa. 1996), to support its position. This case is inapposite. In *Halfhill*, the taxpayer, a trucking company, had treated its only truck driver as an employee. A few years later the taxpayer changed its business operations and retained additional truckers as independent contractors. *Halfhill*, 927 F. Supp. at 173. The only substantive consistency issue before the Court was whether the new drivers held a substantially similar position as that held by the old driver. The issue presented here, which was not addressed in *Halfhill*, is whether Dr. Wilson's anomalous treatment as an employee and his quick conversion to an independent contractor - - a status consistent with the other Psychologists - - disrupts substantive consistency.

Kentfield is irrelevant. The evidence demonstrates that Dr. Wilson's role was significantly different from the other Psychologists - - he was the only Psychologist developing Kentfield's psychological services department. Naturally, Dr. Wilson's position grew as he built the department. The fact that Dr. Wilson's role may have increased, however, does not deny the fact that, even initially, he provided a different function than the other Psychologists.

The fact that Dr. Wilson's role may have overlapped with the other Psychologists does not mean that they held similar positions. As the Director, Dr. Wilson's position went above and beyond the other Psychologists and these tasks were unique to the Directorship. Indeed, Dr. Wilson contracted to provide oversight and direction. The other Psychologists had not such obligations. (*See* Supp. Mem. P & A's at 12-14). Accordingly, even if Dr. Wilson shared some tasks with the other Psychologists, his role was substantially different - - not substantially similar to - - the other Psychologists.

The case of *North Louisiana Rehab. Ctr. v. United States*, provides persuasive authority under which the Court should find that, as a matter of law, Dr. Wilson's Director position was different from the role fulfilled by the other Psychologists. In *North Louisiana Rehab*, the United States District Court for the Western District of Louisiana determined that an employee staff physician served a different function than independent contractor medical directors, even though some of her duties "overlapped with the duties of medical directors." *North Louisiana Rehab. Ctr. v. United States*, 179 F. Supp. 2d 658, 666 (W.D. La. 2001). Here, the uncontested evidence demonstrates that although Dr. Wilson

-4-

may have shared some tasks with the other Psychologists, he, like the staff physician, served a different function.[2]

For these reasons, Kentfield has satisfied the substantive consistency test with respect to the other Psychologists because their role was substantially different from Dr. Wilson.

### B. Kentfield Has Met The Reporting Requirement Of Section 530.

There is no question that the reporting requirement found in Section 530(a)(1)(B) is analyzed on a period-by-period basis and only for the audit years in question. During each year of the audit period, Kentfield treated all of the Psychologists, including Dr. Wilson, as independent contractors and filed 1099s accordingly. Kentfield has, therefore, met the reporting requirement.[3]

In its Response, the United States does not dispute that Kentfield has met the reporting requirement. Now, however, in a newly formed argument, the United States contends that under Section 530(a)(1)(A), Kentfield is not entitled to Section 530 relief

---

[2] Based on the evidence presented in that case, the Court noted that the staff physician spent less time on administrative tasks than the medical directors, creating a distinction between the two positions. Dr. Wilson certainly spent more time on supervisory and administrative responsibilities than the other Psychologists spent on these tasks.

[3] The United States criticizes the citation of an IRS Memorandum. The substance of Kentfield's argument, which goes uncontested, is based on the language of Section 530. The IRS Memorandum clearly supports Kentfield's position and it, too, is premised on the language of the provision as well as the position previously taken by the IRS with respect to reporting consistency. The IRS Memorandum further bolsters Kentfield's argument.

solely with respect to Dr. Wilson. According to the United States, under this provision a taxpayer "must not have treated the individual as an employee for *any* period." (Def.'s Resp. to Pl.'s Supp. Mem. at 9 (emphasis in original)).

The United States' position is incorrect when Section 530(a) is read as a whole. Section 530(a) provides that:

> (a) Termination of certain employment tax liability.
>
> (1) In general. If - -
>
> (A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and
>
> (B) in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee,
>
> then, *for purposes of such taxes for such period* with respect to the taxpayer, the individual shall be deemed to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee.

Revenue Act of 1978, § 530(a), Pub. L. No. 95-600, Stat. 2763 (emphasis added). Read in its entirety, Section 530(a) clearly limits the determination of whether a taxpayer is obligated to pay employment taxes on the worker in question on a period-by-period basis and only during the audit years. Indeed, the "for such period" limitation drafted into the final paragraph of Section 530(a) is identical to the language used in Section 530(a)(1)(B) (the

reporting requirement). And, as demonstrated, the analysis under that section is applied in this same manner.[4]

## II. KENTFIELD IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PSYCHOLOGISTS WERE PROPERLY TREATED AS INDEPENDENT CONTRACTORS UNDER THE APPLICABLE COMMON LAW RULES.

The uncontested evidence demonstrates that Kentfield properly treated the Psychologists as independent contractors under the applicable common law rules. Kentfield did not control the means and manner in which the Psychologists worked, and, in addition, Kentfield's treatment of the Psychologists as independent contractors was consistent with many of the other factors traditionally employed to determine independent contractor status. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1982) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)) (listing common law factors including the right to control, the provision of employee benefits, and the tax treatment of the worker); *Farlow v. Wachovia Bank of North Carolina*, 259 F.3d 309, 316 (4th Cir. 2001) (finding worker to be an independent contractor because, *inter alia*, the worker was treated as a independent contractor for tax purposes and the worker paid her own taxes, the worker did not receive employee benefits, the worker's contract designated her as an independent contractor, the worker did not have an exclusive relationship with the hirer, and the hirer did not exercise control over her work).

---

[4] The United States' new argument applies *only* to Dr. Wilson and does not effect Kentfield's entitlment to relief with respect to the other Psychologists; that is, the United States contends that "Section 530(a)(1)(A) precludes [Kentfield] from obtaining Section 530 relief compensation paid to Dr. Wilson." Accordingly, even if the United States succeeds in this argument, it would only effect relief with respect to Dr. Wilson. Kentfield is still entitled to relief with respect the remaining Psychologists.

Kentfield has successfully demonstrated that:

- Kentfield did not exercise the necessary level of control over the Psychologists for them to be deemed employees. (Osterweil Dep. at 50:19-54:19, Ex. 13 to Pl.'s P & A; Wilson Dep. at 57:22-58:16, Ex. 1 to Supp. Mem. P & A).

- The Psychologists expected to be treated as independent contractors as the contracts between the Psychologists and Kentfield explicitly made them independent contractors. (*See* Sample Psychologist Contracts ¶ 10, Ex. 21, to Pl.'s P & A).

- The Psychologists were not provided with malpractice insurance. (Sample Psychologist Contracts ¶ 17, Ex. 21 to Pl.'s P & A; Wilson Dep. at 20:9-11, Ex. 1 to Supp. Mem. P & A).

- The Psychologists, not Kentfield, were required to pay all necessary taxes, (Sample Psychologists Contracts at ¶ 10.2, Ex. 21 to Pl.'s P & A), which they did. (Osterweil Dep. at 49:14-17, Ex. 4 to Supp. Mem. P & A).

- The Psychologists were employees of their own professional corporations. (Osterweil Dep. at 14:16-15:2, Ex. 2).[5]

The United States does not refute these facts with evidence of its own and it has failed to advance any evidence to suggest that the Psychologists were, in fact, employees. Rather, all the United States manages to do is criticize Kentfield's evidence. Such a tactic is insufficient to defeat summary judgment. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party *must come forward with specific facts showing that there is a genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

---

[5] In its Supplemental Memorandum, Kentfield mis-cited the pages of Dr. Osterweil's testimony in which she testified that she was in private practice while she was also an independent contractor at Kentfield. The correct citation appears in this brief. This evidence proves that the Psychologists were not committed-full time to Kentfield and did not have an exclusive relationship with the facility.

-8-

(1986) (emphasis added) (citations omitted). It is not enough to raise a mere "metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, or to rest upon mere denials. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

Failing to "come forward with specific facts," *Matsushita Elec. Indus. Co.,* 475 U.S. at 586-87, the United States has not raised a genuine issue of material fact, and Kentfield is entitled to summary judgment.

The case of *Western Neuro Care, Inc. d/b/a Tustin Rehabilitation Hospital v. United States,* No. SA-CV-01-775 (AHS) (U.S.D.C. C.D. Cal. filed Feb. 28, 2002) provides the Court with persuasive authority. In *Western Neuro Care,* the United States District Court for the Central District of California determined, on facts and circumstances almost identical to this case, that another CMS subsidiary was entitled to Section 530 relief with respect Psychologists *and* that the hospital had properly treated Psychologists as independent contractors under the common law rules. Indeed, the issues were so clear that the Court, in reaching its decision, adopted wholesale the taxpayer's statement of facts and conclusions of law.

### **CONCLUSION**

Based on the foregoing arguments and authorities and on the arguments and authorities set forth in Kentfield's summary judgment papers previously submitted to the

Court, Kentfield respectfully requests that its Motion for Summary Judgment be granted and that judgment be entered in its favor and against the defendant United States of America.

Respectfully submitted,

Jeffrey Cooper (PA I.D. No. 21181) (*Pro Hac Vice*)
Alexander S. Helderman (PA I.D. No. 84390)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
(215) 751-2096

Attorneys for Plaintiff
Kentfield Medical Hospital Corp.

Dated: May 16, 2002

# EXHIBIT 1

Case3:01-cv-02989 Document26 Filed05/16/02 Page14 of 19

KENTFIELD vs. USA             Multi-Page™             JAMES C. WILSON, PH.D.
                                                              05-07-01

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

---oOo---

KENTFIELD MEDICAL HOSPITAL
CORPORATION,

    Plaintiff,

vs.                           No. CV-00-C-0500-S

UNITED STATES OF AMERICA,

    Defendants.
_____/

Deposition of

JAMES C. WILSON, Ph.D.

Monday, May 7, 2001

SOUZA & LERSCHEN
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566

Reported by:
DEBORAH E. JILKA, CSR
License No. 5942

|  | Page 22 |
|---|---|
| 14:32 1 | Do you know who Mr. Misitano was? |
| 14:32 2 | A. Well, it says senior vice president. |
| 14:32 3 | Q. At the time that you entered this agreement |
| 14:32 4 | and any prior agreements for 1988 or 1989, do you recall |
| 14:32 5 | meeting with Mr. Misitano? |
| 14:32 6 | A. I don't recall meeting with him, no. |
| 14:32 7 | Q. You stated when you first were employed at the |
| 14:33 8 | hospital you were the only psychologist; is that |
| 14:33 9 | correct? |
| 14:33 10 | A. I believe I was the only psychologist |
| 14:33 11 | employed. Now, there may have been, as I indicated |
| 14:33 12 | before, other people that had a prior relationship with |
| 14:33 13 | the hospital who were in private practice who came in on |
| 14:33 14 | an occasional basis to see patients there. I don't know |
| 14:33 15 | who those individuals are. I know that there were |
| 14:34 16 | psychologists that did have some contact with the |
| 14:34 17 | hospital prior to my being employed there. |
| 14:34 18 | Q. Was there a time when other psychologists |
| 14:34 19 | began to work at the hospital on a full-time basis at |
| 14:34 20 | Kentfield Hospital? |
| 14:34 21 | A. After I began working there? |
| 14:34 22 | Q. Yes. |
| 14:34 23 | A. Yes. As the department grew, as I developed |
| 14:34 24 | the program and the services, more people were hired. |
| 14:34 25 | And that included other psychologists, licensed |

|  | Page 23 |
|---|---|
| 14:34 1 | psychologists and interns that were part of an |
| 14:34 2 | internship program that was developed there. |
| 14:34 3 | Q. Dr. Wilson, I'd now like to have you take a |
| 14:35 4 | look at Exhibit No. 2 and just go through your |
| 14:35 5 | psychologist agreement with you. |
| 14:35 6 | Was there a time when you were formally |
| 14:35 7 | appointed head of psychology or head of neuropsychology |
| 14:35 8 | at Kentfield Hospital? |
| 14:35 9 | A. Well, when you say "formally appointed," it |
| 14:35 10 | was sort of a role that I fell into because I was -- I |
| 14:35 11 | was sort of given the designation of developing the |
| 14:35 12 | program, the head injury program, psychological side and |
| 14:35 13 | behavioral side in terms of treatments and services. |
| 14:35 14 | So at that point, given that I was the only |
| 14:35 15 | employee initially, I was the only employee and the |
| 14:35 16 | director of the department. But as the department grew, |
| 14:35 17 | that role developed a little bit more and I had |
| 14:35 18 | supervisory responsibilities and so forth. |
| 14:36 19 | Q. Now, Paragraph 2 of the Psychologist |
| 14:36 20 | Agreement, which is Exhibit 2, lists a number of |
| 14:36 21 | different responsibilities that you had as a |
| 14:36 22 | psychologist. Before I go into the specific, ask you |
| 14:36 23 | questions about the specific responsibilities, I'd like |
| 14:36 24 | to ask you first just to summarize what your |
| 14:36 25 | responsibilities were. |

|  | Page 24 |
|---|---|
| 14:36 1 | A. Well, I had the responsibility of providing -- |
| 14:36 2 | foremost, providing patient care to the patients in the |
| 14:36 3 | hospital. And that included psychological and |
| 14:36 4 | neuropsychological services, cognitive remediation, |
| 14:36 5 | behavioral services, counseling, psychotherapy, the |
| 14:36 6 | whole range of psychological services that a |
| 14:36 7 | psychologist would provide to a medical population, |
| 14:36 8 | specifically a brain-injured population, because that's |
| 14:37 9 | the unit that I was most focused on. |
| 14:37 10 | So that's -- that was my foremost set of |
| 14:37 11 | responsibilities. I had other responsibilities in terms |
| 14:37 12 | of, as I said, supervision of other people that were |
| 14:37 13 | employed, a behavioral specialist, a testing technician, |
| 14:37 14 | eventually psychologists that were hired. And so I |
| 14:37 15 | would provide direct supervision, one-to-one supervision |
| 14:37 16 | for those staff, provide inservice training and |
| 14:37 17 | educational sessions for those staff and other Kentfield |
| 14:37 18 | staff. |
| 14:37 19 | I also participated in presentations that the |
| 14:37 20 | hospital staff gave to the community, to other |
| 14:37 21 | professionals, to special organizations such as |
| 14:38 22 | organizations that deal with brain trauma. |
| 14:38 23 | I participated with the medical director in |
| 14:38 24 | some research that was later given in terms of |
| 14:38 25 | presentation. |

|  | Page 25 |
|---|---|
| 14:38 1 | Those were my main responsibilities. But I |
| 14:38 2 | also participated in the utilization review committee, |
| 14:38 3 | which was a committee that reviewed the length of stay |
| 14:38 4 | of residents at the hospital. |
| 14:38 5 | I also participated, I believe, in quality |
| 14:38 6 | assurance process. I had team meetings that I attended |
| 14:38 7 | every week to discuss with other professionals the |
| 14:38 8 | patient's progress. So it was quite an active role that |
| 14:38 9 | I played. |
| 14:38 10 | Q. Let me now go down some of the specific |
| 14:39 11 | requirements under your contract and just ask for you to |
| 14:39 12 | explain in your own words what each of these |
| 14:39 13 | responsibilities entailed. |
| 14:39 14 | MR. COOPER: Object to the form of the question. |
| 14:39 15 | MR. KAUFMAN: I didn't ask a question. |
| 14:39 16 | MR. COOPER: I object to your preamble. You used |
| 14:39 17 | the word "requirements." |
| 14:39 18 | MR. KAUFMAN: Excuse me. Responsibilities under |
| 14:39 19 | the terms of contract. |
| 14:39 20 | Q. Paragraph 1 states: |
| 14:39 21 | "Doctors shall participate in any |
| 14:39 22 | orientation required by the Hospital, and |
| 14:39 23 | shall abide by the policies and procedures of |
| 14:39 24 | the Hospital as they may be amended from time |
| 14:39 25 | to time, including but not limited to any |

# EXHIBIT 2

Case3:01-cv-02989 Document26 Filed05/16/02 Page17 of 19

KENTFIELD vs. USA     Multi-Page™     DAWN A. OSTERWEIL, PH.D.
05-08-01

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

---oOo---

KENTFIELD MEDICAL HOSPITAL
CORPORATION,

    Plaintiff,

vs.                        No. CV-00-C-0500-S

UNITED STATES OF AMERICA,

    Defendants.
_____/

Deposition of

DAWN A. OSTERWEIL, PH.D.

Tuesday, May 8, 2001

SOUZA & LERSCHEN
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566

Reported by:
DEBORAH E. JILKA, CSR
License No. 5942

### Page 14

16:49 1  Behrmann.
16:49 2      Q. When you entered into this agreement, what did
16:49 3  you understand your responsibilities to be at the
16:49 4  hospital?
16:49 5      A. That I was going to see patients in individual
16:49 6  psychotherapy, neuropsychological assessment, education,
16:49 7  cognitive remediation, to provide family support and
16:50 8  education, to work with patients both on the inpatient
16:50 9  unit as well as the outpatient unit, and to meet with
16:50 10 physicians as needed, to meet with the team as needed,
16:50 11 to attend team rounds and obviously to provide whatever
16:50 12 psychological services were warranted for patient care
16:50 13 ethically and legally, professionally.
16:50 14     Q. Were you working at the hospital full-time or
16:50 15 was it a part-time position for you?
16:50 16     A. I was there part-time.
16:50 17     Q. Were you also in private practice at that
16:50 18 time?
     19     A. Yes.
16:50 20     Q. Where were you in private practice?
16:50 21     A. In San Francisco, 2116 Sutter Street.
16:50 22     Q. Approximately what percentage of your time was
16:51 23 in private practice as opposed to working at Kentfield
16:51 24 Hospital?
16:51 25     A. I was at Kentfield 24 hours a week, and the

### Page 15

16:51 1  remainder of my week was in my private practice, so
16:51 2  another 20 hours or so in my private practice.
16:51 3      Q. During the term of the contract you have
16:51 4  before you, did that 24-hour time frame change?
16:51 5      A. Not in this contract, no.
16:51 6      Q. Were there times where you worked more than 24
16:51 7  hours a week at the hospital or was that a fixed amount?
16:51 8      A. I'm sure there were times that I put in more
16:51 9  than that, yes. But I was paid for a maximum of 24
16:51 10 hours per week.
16:51 11     Q. So you weren't reimbursed for any additional
16:51 12 time?
16:51 13     A. No, I was not.
16:51 14     Q. How was -- the fee you were paid under this
16:52 15 contract, how was that negotiated?
16:52 16     A. Not very well on my part apparently.
16:52 17 Mr. Behrmann offered that to me.
16:52 18     Q. And you accepted it?
16:52 19     A. Yes, I did.
16:52 20     Q. When you began at Kentfield Hospital, what was
16:52 21 Dr. Wilson's position?
16:52 22     A. He was the director of neuropsychology
16:52 23 service.
16:52 24     Q. What was your working relationship with him?
16:52 25     A. He was -- I don't recall exactly the

### Page 16

16:53 1  specifics. However, he probably was the person who told
16:53 2  me which referrals to see unless one of the physicians I
16:53 3  spoke to or ran into asked me to see a particular
16:53 4  patient. So we would keep in touch about -- Dr. Wilson
16:53 5  and I would keep in touch about which patients needed to
16:53 6  be seen, and we would just discuss any pertinent issues
16:53 7  related to the neuropsychology service and patient care
16:53 8  as they came up.
16:53 9      Q. Did he supervise your work?
16:53 10     A. Initially I met with him on a weekly basis in
16:53 11 consultation.
16:53 12     Q. Did that change over the term of your
16:53 13 relationship with the hospital?
16:53 14     A. Yes, it did.
16:53 15     Q. How did that change?
16:53 16     A. I no longer saw him for consultation on a
16:53 17 weekly basis.
16:54 18     Q. When did that circumstance change?
16:54 19     A. I don't recall. It may have been -- I don't
16:54 20 recall specifically.
16:54 21     Q. What was your relationship with Mr. Behrmann
16:54 22 or any other administrators of the hospital during the
16:54 23 time you were at the hospital?
16:54 24     A. Can you be more specific?
16:54 25     Q. Mr. Behrmann was a nonmedical administrator of

### Page 17

16:54 1  the hospital; is that correct?
16:54 2      A. Are you asking me about his background or are
16:54 3  you asking me what his role was?
16:54 4      Q. What did you understand his role to be at the
16:54 5  hospital when you first began working there?
16:54 6      A. I believe in the beginning, again, he was the
16:54 7  COO, and he later became the CEO.
16:54 8      Q. What was your interaction with Mr. Behrmann?
16:54 9      A. I negotiated my contracts with him. I
16:55 10 discussed issues that may have arisen over the course of
16:55 11 my work there with him, if they were administrative in
16:55 12 nature and required some administrative guidance or
16:55 13 focus or intervention, and I discussed at times, program
16:55 14 development with him.
16:55 15     Q. Did he review any of your psychological work?
16:55 16     A. No, he did not, not to my knowledge.
16:55 17     Q. Did anyone other than Dr. Wilson review your
16:55 18 psychological work?
16:55 19     A. No, not formally.
16:55 20     Q. What was your relationship with the other
16:55 21 psychologists who were on staff at the hospital?
16:56 22     A. We were each involved with different teams in
16:56 23 the hospital, so that we independently attended team
16:56 24 rounds and were involved with -- you know, we spoke w
16:56 25 each other informally generally when we need to touch

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Second Reply Brief In Support Of Kentfield Medical Corp.'s Motion For Summary Judgment was filed via Electronic Filing on counsel below on this 16th day of May, 2002.

Michael N. Wilcove, Esquire
Trial Attorney, Tax Division
U.S. Department Of Justice
555 4th Street, N.W.
Room 6223
Washington, D.C. 20001

*Jeffrey Cooper*